In re Ronald W. HAMMOND and Diane A. Hammond, d/b/a Sooner Energy, Debtors.

Bankruptcy No. 82–02317–B.

United States Bankruptcy Court, W.D. Oklahoma.

Nov. 14, 1983.

**220**

Ann L. Faford, of Crowe & Dunlevy,. Oklahoma City, Okl., for Ronald W. Hammond.

Robert I. Owen, of Owen & Owen, Oklahoma City, Okl., for CMC Investments, Inc. and Patco Investments, Inc.

## MEMORANDUM DECISION AND ORDER

ROBERT L. BERRY, Bankruptcy Judge.

The question presented in this matter is a narrow one: Are future annual installment payments, due under an anti-competition clause, "property of the estate" pursuant to 11 U.S.C. § 541. A brief summary of the underlying facts is appropriate.

Ronald W. Hammond, debtor in possession (hereinafter "Hammond"), owned a thirty percent interest in Sooner Chemical Specialities (hereinafter "Sooner"). On October 1, 1981, PQ Corporation (hereinafter "PQ") entered into a Contract for Sale and Purchase of Corporate Stock with Sooner and its shareholders. Each shareholder was paid a base price for their stock. Additionally, as part of this Contract, the shareholders agreed not to "take employment with,

act on behalf of, or own any interest in excess of six percent . . . in any enterprise" which is competing with Sooner. *Contract For Sale,* paragraph 5.17. As consideration for the noncompetition covenant Hammond was to receive a total of one million two hundred and sixty thousand dollars ($1,260,000.00) in installments, due and payable in the following manner:

| | |
|---|---|
| September 30, 1982 | $360,000.00 |
| September 30, 1983 | 360,000.00 |
| September 30, 1984 | 180,000.00 |
| September 30, 1985 | 180,000.00 |
| September 30, 1986 | 180,000.00 |

On November 30, 1982, Hammond filed a petition for a Chapter 11 reorganization. Subsequently, Hammond filed a Request for Determination of Property of the Estate and requested an order of this Court determining that both the payment due September 30, 1983, and all subsequent payments are not property of the estate.

Hammond argues that the future payments due him from PQ are contingent on his performance of the covenant not to compete. All future payments are subject to absolute forfeiture upon breach of the covenant. The amounts become due and owing only upon compliance with the covenant not to compete. Therefore, Hammond posits, compliance with the noncompetition covenant is performing services pursuant to § 541(a)(6) and earnings derived ·from performance should therefore be excluded from property of the estate.

Patco Investments, Inc. and CMC Investments, Inc. (collectively, hereinafter "Investments") argue that the services Hammond is to perform, ie. not to compete with PQ, are not "services" contemplated by § 541(a)(6); "[e]quating 'doing nothing' with 'services' is not consistent with legal use or common use of language." *Supplemental Brief of Investments* at 10.

Section 541 of the Bankruptcy Code provides that "[the] estate is comprised of . . . all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). The legisla-

tive history of § 541 stresses the broad scope of property of the estate under the Code. It further notes that § 541 encompasses more property than its predecessor, § 70a(5) of the Bankruptcy Act; that the holding of *Segal v. Rochelle,* 382 U.S. 375, 86 S.Ct. 511, 15 L.Ed.2d 428 (1966), remains viable under the Code. H.R.Rep. No. 595, 95th Cong., 1st Sess. 367–68 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 82–83 (1978), U.S.Code Cong. & Admin.News 1978, p. 5787. However, there are certain exclusions. "[E]arnings from services performed by an individual debtor after the commencement of the case" are excluded from property of the estate. 11 U.S.C. § 541(a)(6). It is § 541(a)(6) on which Hammond bases his argument. Only recently, the broad scope of § 541 was discussed in *United States v. Whiting Pools, Inc.,* —— U.S. ——, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983).

In support of his position, Hammond cites us to *In re Dunlap,* 27 B.R. 728 (Bkrtcy.M. D.N.C.1983). The Court held that the debtor in *Dunlap* did not have a vested right in thirty percent of certain monthly payments which were attributable to the sale of the debtor's insurance agency. Payment of these sums was contingent upon the debtor not competing with the buyer, and therefore, the Court held, the thirty percent was not subject to execution. " 'A debt which is uncertain and contingent, in the sense that it may never become payable, is not subject to levy and sale ...'." *Id.* at 730 (quoting *Cohen v. Cohen,* 126 N.J.L. 605, 20 A.2d 594, 596 (1914)). *Dunlap* did not address the issue of what constitutes property of the estate. Hence, any potential value to the facts at bar would be solely by way of analogy.

Hammond next cites *In re Kervin,* 19 B.R. 190 (Bkrtcy.S.D.Ala.1982) as supportive of his position. The issue in *Kervin* was whether renewal insurance premiums earned subsequent to the filing of the bankruptcy petition are part of the estate in bankruptcy. Finding that the debtor spent twenty percent to thirty percent of his time servicing the renewal accounts, the *Kervin* Court noted that

[h]is commissions on renewals which accrued after bankruptcy were excluded from property of the estate by virtue of Section 541(a)(6) of the Bankruptcy Code, since they were 'earnings from services performed after the commencement of the case.' He did not become entitled thereto until he had performed certain personal services such as the sale of new policies of insurance and 'servicing' the old policies resulting in the payment of premiums thereon.

*Id.* at 194. The quoted language clearly indicates that the *Kervin* Court envisioned that some sort of demonstrable services were to be provided by the debtor. In the instant case, we are faced with the rather anomalous argument that compliance with the anti-competition covenant contemplates that the debtor is performing services; the proceeds derived therefrom to be considered as earnings received from services performed by Hammond after the commencement of the bankruptcy proceeding. The anomaly arises in that it is entirely possible, based on history past, that Hammond will do absolutely nothing, other than comply with the anti-competition covenant. Yet, if we accept this argument, are we equating "doing nothing", with "services performed".

The issue of receiving payments based on an agreement not to compete was tangentially raised in *In re Marshburn,* 5 B.R. 711 (Bkrtcy.D.Colo.1980), which was cited by the *Kervin* Court. The issue in *Marshburn* was whether termination payments, which had as their basis a percentage of the service compensation, net premium collections, and renewal premiums on insurance policies attributable to sales made by the debtor before, but paid subsequent to, the filing of bankruptcy, are property of the estate. "The answer ... depends on whether such payments were *earned* prior to the filing of the petition." *In re Marshburn, supra,* at 713 (emphasis supplied). The Court acknowledged that while all termination payments to be paid postpetition were indeed based upon policies sold and services performed prior to the filing and would therefore be considered as property of the estate,

there existed one possible exception. This exception was a provision contained in the debtor's employment contract which allowed that in order to receive the termination payments, the debtor was not to compete for a period of twelve months following termination with the debtor's former employer. The Court held that although the termination payments were not payable until *after* the filing of bankruptcy, the debtor had earned all termination payments to be paid *prior* to that time. Although the debtor did not argue that compliance with the agreement not to compete equated with "services performed" pursuant to § 541(a)(6), the Court, in commenting on the noncompetition portion of the employment contract, stated "[r]equired continued service, if it can even be characterized as such, is minimal when compared to the substantial services rendered by the Debtor in selling the policies prior to his termination and prior to his bankruptcy filing." *In re Marshburn, supra,* at 713–14. The Court also noted that the payments due the debtor continued even in the event of his death, further emphasizing the minimal nature of his post-termination services.

The issue of what constitutes property of the estate has arisen in the context of whether military retirement benefits owed subsequent to the filing of bankruptcy should be considered property of the estate. The Fifth Circuit in *In re Nunnally,* 506 F.2d 1024 (5th Cir.1975), decided under § 70a(5) of the Bankruptcy Act, 11 U.S.C. § 110a(5), held that pension payments are periodic payments made during a time when the pensioner may well have no or few other sources of income. Removal of the interest, the Court held, would have had the effect of hampering the debtor's efforts to make a new start. Therefore, the benefits should not be considered property of the estate. Similarly, *Matter of Haynes,* 679 F.2d 718 (7th Cir.1982), *cert. denied sub nom. Miller v. Haynes,* —— U.S. ——, 103 S.Ct. 299, 74 L.Ed.2d 281 (1982), involved the issue of whether military retirement benefits were property of the estate. In holding that such benefits were not property of the estate, the Court stated:

In light of the obligations imposed on a military retiree as conditions of receipt of retirement pay, military retirement pay is actually reduced compensation for reduced current services (citations omitted). Haynes's [sic] retirement pay is proceeds for services performed after the filing of the bankruptcy petition, and, thus, it is not property of the estate. 11 U.S.C. § 541(a)(6).

679 F.2d at 719. Clearly, the Court's ruling was based on its view that services were to be performed *after* the filing of bankruptcy.

The issue of what constitutes property of the estate has most frequently arisen in the context of tax refunds. We come then to a discussion of *Segal v. Rochelle,* 382 U.S. 375, 86 S.Ct. 511, 15 L.Ed.2d 428 (1966). In *Segal,* the debtors had filed their bankruptcy petition in 1961. The debtors subsequently received loss-carryback tax refunds. The losses underlying the refunds had been suffered prior to the filing of bankruptcy; the losses were carried back to the years 1959 and 1960 to offset net income on which the debtors had paid taxes. Justice Harlan, writing for a unanimous Court, held that potential claims for loss-carryback tax refunds, realized after the close of the year in which the taxpayer files a bankruptcy petition, for losses suffered prior to the filing of the petition, are "property" at the time of filing of the petition within the meaning of § 70a(5) of the Bankruptcy Act, 11 U.S.C. § 110a(5).

*In re Rash,* 22 B.R. 323 (Bkrtcy.D.Kan. 1982) involved the question of whether income tax refunds attributable to excessive withholdings in the same year in which bankruptcy petitions were filed and received in the following year were property of the debtors' estates. The debtors had argued that the refunds should not be considered property of the estate because at the time of the filing of their petitions, they had no vested right to the refunds. The Court in *Rash,* relying on *Segal v. Rochelle, supra,* held that such refunds were property of the estate; however, only such portion of each refund attributable to prepetition

withholding was properly included in the estate. The debtors had attempted to distinguish *Segal* on the basis of the different types of refunds involved, income tax refunds in *Rash*, and a loss carryback refund in *Segal*. "[T]here is a dubious distinction since in both cases, the right to the refunds is dependent on circumstances arising in the year of the petition . . . ." *In re Rash, supra,* at 325.

Having previously noted that § 541 of the Code was intended to broaden § 70a(5), *Segal* nevertheless still has viability as a standard for determining what constitutes property of the estate. The test applied by the Court was whether the nature of the property interest was "sufficiently rooted in the bankruptcy past and so little entangled with the bankrupts' ability to make an unencumbered fresh start that it should be regarded as 'property' under § 70a(5)." 382 U.S. at 380, 86 S.Ct. at 515. However, " '[i]t is impossible to give any categorical definition to the word 'property', nor can we attach to it in certain relations the limitations which would be attached to it in others.' " *Id.* at 379, 86 S.Ct. at 514 (quoting *Fisher v. Cushman* 103 F. 860, 864 (1st Cir.1900)). "In determining the term's scope—and its limitations—the purposes of the Bankruptcy Act 'must ultimately govern'." *Kokoszka v. Belford,* 417 U.S. 642, 645, 94 S.Ct. 2431, 2433, 41 L.Ed.2d 374 (1974) (quoting *Segal v. Rochelle, supra,* 382 U.S. at 379, 86 S.Ct. at 514). The debtors in *Segal* had argued that under the statutory scheme, no refund could be claimed from the government until the end of the year; however, "[p]ostponed enjoyment does not disqualify an interest as 'property'." *Segal v. Rochelle, supra,* at 380, 86 S.Ct. at 515.

Turning to the facts at bar, *In re Kervin, supra; In re Marshburn, supra; In re Nunnally; supra;* and *Matter of Haynes; supra,* all were decisions whose findings that monies that were received postpetition by the respective debtors, and not to be considered as property of the estate, were grounded in the finding that the debtors, in order to receive such payments, were required to perform certain services. As Investments has strenuously noted, Ham-

mond's entitlement to the noncompetition payments is predicated upon nothing more than compliance with the agreement. From now until September 30, 1986 then, Hammond need do no more than not compete with PQ in order that he may receive a substantial sum of money. The question becomes, is this "services performed" as envisioned by the drafters of the Bankruptcy Code? The "crucial analytical key" is not to be found "[i]n an abstract articulation of the statute's purpose, but in an analysis of the nature of the asset involved in light of those principles." *Kokoszka v. Belford, supra,* 417 U.S. at 646, 94 S.Ct. at 2434.

■ In our opinion, Hammond has not done all acts necessary to accrue his right to the future payments. If an entity, be it Hammond or Hammond's estate, is to receive the payments in question, Hammond must abide by the agreement. We cannot force Hammond to comply. "The bankrupt . . . cannot be compelled to perform work or services for the benefit of his creditors or his trustee in bankruptcy." 3 *Remington on Bankruptcy* § 1228.25 (1941). It is a foil which thrusts both ways. Hammond is therefore performing a service which is not "sufficiently rooted" in the bankruptcy past so as to render the payments property of the estate.

The second prong of the *Segal* test is that the payments are "so little entangled in the debtor's ability to make a fresh start" that they should be excluded from the estate. Investments contends that permitting Hammond to receive the payments is a "fresh start" with a vengance. This argument misses the mark regarding the concept of the "fresh start". "Providing the bankrupt with a 'fresh start' means assuring him that assets to which he may become entitled *in the future* will be acquired free of any pre-bankruptcy obligations." *Matter of Turpin,* 644 F.2d 472, 475 (5th Cir.1981) (emphasis in original).

We find support for our decision in the case of *In re Ryerson,* 30 B.R. 541 (Bkrtcy. 9th Cir.1983). The *Ryerson* Court held that a debtor's termination payments were prop-

erty of the estate only as to those payments attributable to prepetition work. Debtor's employment contract had contained an anti-competition clause which restricted the debtor from conducting similar business for three years after termination within a defined area. The debtor attempted to argue that the termination payments should be construed as payments for future services. The Court did not accept this argument, noting that the payments were not conditioned upon compliance with the anti-competition clause; however, the Court intimated that if such were the case, the Court would have ruled otherwise.

The last item which we need address is the question of whether the entire payment which was due September 30, 1983, should be considered payment for "services performed". (This sum was paid into Court, pending the outcome of this decision). Since Hammond complied with the covenant not to compete for two months prior to the filing of the bankruptcy petition, Investments contends that such portion of the payment should be allocated to the estate. The question of allocation based on a prorata share was discussed in *In re Rash, supra;* and *In re Koch,* 14 B.R. 64 (Bkrtcy.D.Kan.1981). However, as we have previously held, Hammond is entitled to the payments in question. His right to these payments is conditional upon his non-compliance for a full year. Both *Koch* and *Rash* involved facts distinguishable from these. Since Hammond must comply for a full year, we do not believe that the yearly payments are subject to apportionment. Accordingly, the payments due September 30, 1983; September 30, 1984; September 30, 1985; and September 30, 1986, are not property of the estate, pursuant to 11 U.S.C. § 541(a)(1).

Judgment will be entered accordingly.

Pursuant to B.R. 7052, this Memorandum Decision constitutes our findings of fact and conclusions of law.