**In re Douglas R. & Jane PRINCE.**

**UNSECURED CREDITORS COMMITTEE, Plaintiff,**

v.

**Douglas R. PRINCE and Jane Prince, Defendants.**

**Bankruptcy Nos. 81 B 9964, 89 C 8278.**

United States District Court, N.D. Illinois, E.D.

April 12, 1991.

Daniel A. Zazove, Steven B. Towbin, Towbin & Zazove, Chicago, Ill., for plaintiff.

Mr. David G. Lynch, Rudnick & Wolfe, Chicago, Ill., for defendant.

## MEMORANDUM OPINION

GRADY, District Judge.

This is an appeal pursuant to 28 U.S.C. § 158 from the United States Bankruptcy Court for the Northern District of Illinois (No. 81 B 9964). The decision of the bank-

ruptcy court is reversed, and the case is remanded for further proceedings.

FACTS

Dr. Douglas R. Prince ("Prince"), an orthodontist, and his wife Jane (collectively "the debtors") filed a joint Chapter 11 petition on August 17, 1981. At the time of filing, Prince was the sole shareholder in a professional corporation, Douglas R. Prince, D.D.S., M.S., Ltd., which rendered professional services exclusively through Dr. Prince. On November 4, 1983, the bankruptcy court confirmed the debtors' Amended Disclosure Statement and Plan ("plan"), which provided that Prince would retain the professional corporation's stock and continue to operate his orthodontic practice. In consideration for retaining the stock, Dr. Prince agreed to pay its value to his bankruptcy estate.

In his initial disclosure statement and plan, Prince had proposed to pay his estate $7,500.00 for the stock, an amount equal to the value of the professional corporation's physical assets less the encumbrances on those assets. The Unsecured Creditors' Committee ("Committee") objected to this proposed valuation and entered into negotiations with Prince to modify the plan as to the stock value. The parties were unable to agree on the value and reserved the issue until after confirmation of the plan. The plan provided that, if the parties could not agree on the value of the stock, the bankruptcy court would hold a valuation hearing.

Shortly after confirmation of the plan, Prince negotiated a sale of his practice to another orthodontist, Dr. Timothy J. Clare ("Clare"). On February 25, 1984, Prince and Clare entered into a contract for the sale of all the stock and assets of the professional corporation for a purchase price of $450,000.00 or $500,000.00, depending on the interest rate used. This amount was consistent with the value that Prince had declared in a personal financial statement dated March 1, 1980, sixteen months before the bankruptcy. The sale contract imposed two conditions on Prince beyond the transfer of the stock and assets of the professional corporation. First, the contract (¶ Sixth) prohibited Prince from engaging in an orthodontic practice "in competition with the business hereby sold" for five years within ten miles of Naperville, Yorkville or Morris, Illinois, the communities in which he had conducted the practice. Prince was also required to assist Clare in the transition:

> *Fifteenth: Practice Obligation*—Seller agrees to practice two weeks each month as scheduled during the months of March, April, and May. During the months of June, July, and August Seller shall work in the offices one week per month as scheduled. Seller shall follow the direction of the Buyer in regards to scheduling time with patients, dentists, and a marketing program and shall put forth his best efforts and energies and ideas to promote and develope [sic] the practice in an acceptable manner to Buyer.

The Creditors' Committee and the debtors never did agree on the value of the stock. The debtors insisted that the value was $7,500.00, while the Committee argued that the value was $650,000.00. Judge Wedoff therefore conducted a valuation hearing. At the hearing, the Committee and the debtors each relied principally on their own expert witnesses. Judge Wedoff found that both experts "testified in a credible fashion, consistent with their respective assumptions." The Committee's expert testified that the professional corporation stock was worth $650,000.00, based on capitalization of the stream of income that the practice was likely to produce in the future. According to the bankruptcy court, the Committee's expert "conceded that this value would not exist if Dr. Prince were free to compete with the [professional corporation], and acknowledged that, without the personal goodwill of Dr. Prince, there would be only a nominal value in the corporate stock." *In re Prince*, No. 81 B 9964, Memorandum of Decision at 4 (Sept. 15, 1989) (Wedoff, J.). The debtors' expert opined that the professional corporation's stock had "only nominal value, based on a liquidation analysis that concededly excluded Dr. Prince's personal goodwill." *Id.*

*The Bankruptcy Court's Analysis*

Judge Wedoff began his analysis by analogizing the amended bankruptcy plan to a contract. His objective was to determine "whether the parties intended to include Dr. Prince's personal goodwill in the value of the stock by analyzing the relevant Plan provisions as they relate to the Plan as a whole." *Id.* at 5. The court defined Prince's personal goodwill as "the confidence that his patients had in him as an orthodontist." *Id.* at 3.

The court heard no evidence concerning the intentions of the parties at the time the amended plan was agreed to, but confined itself to an analysis of the terms of the plan itself. Three parts of the plan were found to be relevant to the question of whether the personal goodwill of the debtor was intended to be included. First, the plan contemplated liquidation of the debtors' assets. Under § 541(a)(1) and (6) of the Bankruptcy Code, the estate of the debtor is comprised of "all legal or equitable interests of the debtor in property as of the commencement of the case ...," including "[p]roceeds, product, offspring, rents, or profits of or from property of the estate, except such as are earnings from services performed by an individual debtor after the commencement of the case." Interpreting this provision, Judge Wedoff held that "[u]nder the personal earnings exception, personal goodwill does not enter the debtor's estate and, thus, is not liquidated." He cited *In re Fitzsimmons*, 725 F.2d 1208, 1211 (9th Cir.1984), and *In re Cooley*, 87 B.R. 432 (Bankr.S.D.Tex.1988), in support of this conclusion. Memorandum of Decision at 6.

The second significant aspect of the plan was that, in setting forth "pertinent information concerning their assets," the debtors did not refer to Dr. Prince's personal goodwill. Moreover, in the portion of the plan which describes the professional corporation, there is a reference to the fact that "[d]ebtor has listed the value of the stock of the professional corporation at $25,000 in the schedules." Plan at 19. The court believed these were strong indications "that the Plan does not consider Dr. Prince's personal goodwill an asset to be liquidated." Memorandum of Decision at 6.

The third significant feature of the plan, and the one the court regarded as most important, was that the method specified for valuing the stock "disregards Dr. Prince's personal goodwill." Memorandum of Decision at 6. This section of the plan (pp. 46–47) consists of one paragraph, which Judge Wedoff read as setting forth the valuation method consisting of "three interrelated parts." He concluded that none of the three parts contemplated a valuation of personal goodwill.

## DISCUSSION

*Standard of Review*

We must accept the bankruptcy court's findings of fact unless they are clearly erroneous; however, we review its conclusions of law *de novo*. *In re Excalibur Auto Corp.*, 859 F.2d 454, 457 n. 3 (7th Cir.1988). The bankruptcy court's interpretation of the plan, based solely on the plan without resort to extrinsic evidence, constitutes a legal finding which this court can review *de novo*. *See International Ass'n of Machinists v. General Electric Corp.*, 865 F.2d 902, 905 (7th Cir.1989) (applying, although questioning the continued appropriateness of, the general principle of plenary appellate review of contractual interpretations). Further, the bankruptcy court's determination that, under 11 U.S.C. § 541(a)(6), Dr. Prince's personal goodwill does not enter the debtors' estate and, therefore, is not liquidated is a ruling on a question of law.

*The Earnings Exception*

Judge Wedoff held that Dr. Prince's personal goodwill—"the confidence that his patients had in him as an orthodontist"— was exempted from his bankruptcy estate by virtue of the § 541(a)(6) exclusion for "earnings from services performed by an individual debtor after the commencement of the case." Neither Judge Wedoff's opinion nor the brief of Dr. Prince in this court explains the relationship between goodwill and post-petition earnings. Judge Wedoff relied on two cases in concluding

that § 541(a)(6) exempted Prince's goodwill. *In re Fitzsimmons*, 725 F.2d 1208 (9th Cir.1984), was a Chapter 11 proceeding involving a debtor who practiced law as a sole proprietorship but employed other attorneys and various staff members. The bankruptcy trustee argued that § 541(a)(6) did not apply to any post-petition earnings of the business, even those generated by the services of the debtor-in-possession himself. The debtor, on the other hand, contended that § 541(a)(6) exempted *all* of the post-petition earnings of the practice from the bankruptcy estate. The court held that § 541(a)(6) did apply, but that it exempted:

> only those earnings generated by services personally performed by the individual debtor. FitzSimmons is thus entitled to monies generated by his law practice only to the extent that they are attributable to personal services that he himself performs. To the extent that the law practice's earnings are attributable not to FitzSimmons' personal services but to the business' invested capital, accounts receivable, *good will*, employment contracts with the firm's staff, *client relationships*, fee agreements, or the like, the earnings of the law practice accrue to the estate.

725 F.2d at 1211 (emphasis added).

The case of *In re Cooley*, the other authority cited by Judge Wedoff, involved the question of whether a physician's bankruptcy estate was entitled to the physician's post-petition earnings that were attributable to the goodwill of his practice. The bankruptcy court held that the creditors had failed to demonstrate that the goodwill was "business goodwill" rather than "personal goodwill," 87 B.R. at 442, and that

> his personal goodwill is inextricably bound up with his personal services and is not by operation of the earnings exception property of the estate. Dr. Cooley's personal goodwill is of the same nature as his medical degree and license to practice medicine which although arguably property under state law, are nonetheless inextricably bound up with his postpetition services. *See Ryan v. Lynn*

> *(In re Lynn)*, 18 B.R. 501 (Bankr.D. Conn.1982) (In light of the earnings exception, debtor's medical degree and license are not property of the estate for purposes of bankruptcy law).

87 B.R. at 443.

*Fitzsimmons* and *Cooley* are relevant to the case at hand, but they do not support an earnings exception for Prince's personal goodwill. Both cases involved efforts of the trustee to capture what the courts concluded were clearly earnings from the debtors' post-petition *services*. Judge Wedoff apparently believed that the contract between Prince and Clare called for payments to Prince for his post-petition services. This was true, but only to a very limited extent. Prince was to practice two weeks during each of the months of March, April and May 1984. Then he was to work in the offices one week per month during June, July and August. This latter work would include using his best efforts to promote and market the practice in a manner acceptable to Clare. Thus, the contract did call for some post-petition services by Prince. Some portion of the purchase price for the practice may be attributable to those services, but it could not reasonably be thought that the entire purchase price for the practice, $450,000.00 or more, was in payment for those nine weeks of service.

The other thing required of Prince by the contract was that he refrain from competing with Clare for five years within ten miles of the three locations of the practice. The bankruptcy court did not discuss the covenant not to compete except to observe that the covenant, along with the requirement that Prince use his best efforts to promote the practice, "had the effect of attempting to transfer Dr. Prince's personal goodwill—the confidence that his patients had in him as an orthodontist—to Dr. Clare." Memorandum of Decision at 3. Prince himself believed that his covenant not to compete was what gave the stock practically all of its value. In a letter he wrote to Dr. Clare dated February 27, 1984, he stated:

> The fact that I will covenant not to compete will then allow the patients to stay

with you. The value of the assets and liabilities as we agreed is the $25,000.00 and what the value of the covenant not to compete is, is the $425,000.00 or $475,000.00 at 12% and 10% respectively calculated as per the contract. As we agreed if I sold you the corporation and then I stayed in the area and practiced most if not all the patients would want and choose to remain in my care. You would have the furniture and fixtures and accounts to work already done but not the patients as the patients are free to choose who they want to treat them and would stay with me.

Committee Exh. 15, p. 3. At the conclusion of the letter (pp. 6–7), Prince stated that his explanations were intended to clarify the contract and, unless he heard from Clare to the contrary within two weeks, the letter would be considered part of the contract. The record does not indicate that there was any response from Clare, and there does not appear to be any reason why he would have disagreed with these comments in the letter or have objected to their becoming part of the contract.

The bankruptcy court, in analyzing the amended bankruptcy plan as a contract, attempted to arrive at the intention of Prince and the Creditors' Committee, the parties to the plan. In determining that intent, the nature of the contract between Prince and Clare is relevant. Clearly, Prince understood that the value of his stock resided primarily in the personal goodwill of his practice, which he was transferring by means of his covenant not to compete. This use of a covenant not to compete as the means of transferring the goodwill of a business is well recognized in the law. *See, e.g., O'Sullivan v. Conrad,* 44 Ill.App.3d 752, 3 Ill.Dec. 383, 386, 358 N.E.2d 926, 929 (5th Dist.1976), where the court upheld a restrictive covenant against the contention that it was unreasonably broad:

The interest which the purchaser is entitled to protect by a restraint is the enjoyment and possession of the good will of the property transferred to him.

The exact relationship between the covenant and the goodwill was described as follows:

In exchange for the restriction, the plaintiff is paying the defendant $73,000.00 for good will.

*Id.* 3 Ill.Dec. at 387, 358 N.E.2d at 930. *See also Hamer Holding Group, Inc. v. Elmore,* 202 Ill.App.3d 994, 148 Ill.Dec. 310, 319, 560 N.E.2d 907, 916 (1st Dist. 1990):

[A] covenant ancillary to the sale of a business ensures the buyer that the former owner will not walk away from the sale with the company's customers and goodwill, leaving the buyer with an acquisition that turns out to be only chimerical. (citations omitted) "[I]n the sale of a business the interest to be protected is the value of the goodwill that is purchased...." (citations omitted)

*See also* Hirsh, "The Sale of a Medical Practice," 2 DePaul Bus.Law Journ. 183, 187 (1989) ("The monetary value of the goodwill of a physician's practice depends upon the extent to which his patient base may be transferred to the buyer.") In *Russell v. Jim Russell's Supply, Inc.,* 200 Ill.App.3d 855, 146 Ill.Dec. 152, 158, 558 N.E.2d 115, 121 (5th Dist.1990), the court noted the general rule "that if a business is sold and transferred from one person to another, goodwill, though not specifically mentioned, is transferred as an incident to the business." This point is relevant to the concern of the bankruptcy court that, although the professional corporation stock was mentioned in the plan, there was no separate reference to the goodwill of the practice.

The foregoing authorities cast light on whether the proceeds from Dr. Prince's sale of the professional corporation are "earnings from services performed by [him] after the commencement of the case," and are thus excepted from his estate by virtue of § 541(a)(1), (6). It is difficult to see how this statutory language can be read to describe a sale of corporate stock with a covenant not to compete. The stock itself is not "services," nor are the proceeds from the sale of the stock "earnings from services." The only post-petition

services involved in the Prince–Clare transaction were the transitional services to be performed by Dr. Prince from March through August 1984. As noted above, it may be reasonable to attribute some portion of the purchase price to those services, but the major consideration for the purchase price was Prince's agreement not to compete with Clare and undermine the value of the goodwill he was selling. This covenant did not contemplate "services," nor can any portion of the purchase price allocable to the covenant be considered "earnings from services." Prince was not agreeing to perform services; he was agreeing *not* to perform services for a period of time in certain geographical areas. In both *Fitzsimmons* and *Cooley*, the creditors were attempting to capture income generated by post-petition services actually rendered. Here, with the exception of the nine weeks of transitional assistance, no post-petition services were involved. The distinction between performing services and not performing services was recognized in the case of *In re Weyland*, 63 B.R. 854, 863 (Bankr.E.D.Wis. 1986), where the court stated that it

> does not read "earnings from services performed by an individual debtor after the commencement of the case" to include payments for services *not* performed by the debtor.

(emphasis in original). *See also In re Chastek*, 1988 W.L. 105804 (Bankr.D. Minn.).

This court concludes that the earnings exception of § 541(a)(6) of the bankruptcy code does not apply to the debtor's sale of stock in his personal corporation. None of the components of the transaction—the stock, the personal goodwill and the covenant not to compete—are "services" within the meaning of the statute.

Neither does the rationale of the earnings exception apply to Prince's situation. The "fresh start" contemplated by the exception will not be denied Prince by a disallowance of his attempt to pocket the proceeds of the sale of his business. The restrictive covenant inhibits him from practicing his profession only in very small areas of the State of Illinois. With that exception, he can work as an orthodontist anywhere he likes, and all of his earnings will be free from the claims of his pre-petition creditors.

*Discussion of Other Grounds for Excluding Debtor's Personal Goodwill From His Estate*

The bankruptcy court attached importance to the reference in the plan to the fact that "[d]ebtor has listed the value of stock in the professional corporation at $25,000 in the schedules." Plan at 19. But this brief recitation in the plan does not imply that the Creditors' Committee acquiesced in the $25,000.00 valuation. Had the Committee agreed that the stock was worth $25,000.00, it would have been simple enough to provide in the plan that this was in fact its value. Instead, the plan provided:

> In the event that debtor and the creditors' committee are not able to agree on the value of the professional corporation, it will be necessary to conduct a valuation hearing to determine the present value of the professional corporation.

Plan at 47.

The bankruptcy court was strongly influenced by the absence of any mention of the debtor's personal goodwill in the plan. If Judge Wedoff thought the failure of the plan to mention goodwill meant that the parties intended to exclude it as an element of value, it is not clear why he thought that. While it is true that there is no specific inclusion of goodwill, neither is there anything in the plan that specifically *excludes* it. The failure to exclude should have some significance, or at least warrant some discussion, unless it is assumed that the creditors had a unilateral burden to list every constituent element of the "present value of the professional corporation." Such an assumption, whatever else might be said of it, would seem anomalous in view of the broad definition of "property of the estate" found in § 541 of the code.

The bankruptcy court's analysis of "the Plan's method for valuing the stock" led it to conclude that Prince's personal goodwill was disregarded. It is certainly true that

this language of the plan (B. *Professional Corporation*, pp. 46–47) contains no suggestion that the parties were specifically thinking about Dr. Prince's personal goodwill. More broadly, however, there is no indication in this or any other portion of the plan that the parties were contemplating a sale of the business to a third person. There is no indication that the Creditors' Committee knew Prince intended to sell, and the record is silent as to when Prince formed that intention. The paragraph of the plan dealing with the professional corporation—the section the bankruptcy court regarded as providing for a method of valuation of the stock—begins by reciting that "[t]he professional corporation stock cannot be liquidated or sold in a similar manner as other assets." The paragraph goes on to refer to what might happen "if the debtor were to cease practice or the corporation terminated," but does not address the possibility that the debtor might sell his practice. What the plan apparently contemplated was that Prince would continue to operate the business indefinitely, and what the creditors were seeking was some payment to his estate that would represent the value of the professional corporation apart from his personal services. If the business had not been sold, there would never have been an occasion to consider the value of Prince's personal goodwill. The case would then have been like *Fitzsimmons* and *Cooley*, where, since the debtors did not sell their businesses but continued to operate them, their "personal goodwill [was] inextricably bound up with [their] personal services and is not by operation of the earnings exception property of the estate." *Cooley*, 87 B.R. at 443.

It is uncertain whether the bankruptcy court believed Prince and the Creditors' Committee had decided to exclude personal goodwill from value, or on the other hand, that they had simply failed to think about the matter. For the reasons indicated above, this court finds that the plan does not reveal any mutual intention to exclude personal goodwill as an element of value.

But it does seem possible that there was no thought given to the matter, at least by the Committee. This apparent failure of the parties mutually to contemplate, or, in any event, to provide for what later happened—a sale of the practice by Prince—raises the question of whether the plan can be interpreted to cover valuation in the event of a sale. The provision for a judicial valuation hearing in the event the parties are unable to agree upon a value seems sufficiently unambiguous and unconditional to allow the bankruptcy court to consider any relevant evidence that pertains to "the present value of the professional corporation," whether the valuation is made in the context of a sale to a third party or not. However, this court is hesitant to hold as much on the present appeal, because there may be additional evidence the parties could offer concerning the meaning of the plan.[1]

CONCLUSION

The decision of the bankruptcy court is reversed, and the case is remanded for a determination of the value of the stock in the professional corporation in light of the views expressed in this opinion. The value of Prince's personal goodwill should be included, unless additional evidence on remand supports the conclusion that Prince and the Creditors' Committee mutually intended to exclude it. As evidence of value, the bankruptcy court should consider the purchase price paid by Clare, less the value of the tangible assets and the value of the transitional services rendered by Prince in connection with the sale. The court may also consider any other relevant and admissible evidence which may be brought to its attention on remand.

Reversed and remanded.

1. Neither does this court express any opinion as to whether the parol evidence rule, or any of its exceptions, applies to the plan.