In re Thomas Arthur JONES, Debtor.

UNITED STATES of America, Appellant,

v.

Thomas Arthur JONES, Appellee.

No. 93–4250–RDR.

Bankruptcy No. 92–41978–13.

United States District Court,
D. Kansas.

April 27, 1995.

Richard C. Wallace, Evans & Mullinix, P.A., Lenexa, KS, for debtor.

James J. Long, Office of Special Litigation, Tax Div., Washington, DC, for appellant.

Richard C. Wallace, Evans & Mullinix, P.A., Lenexa, KS, for appellee.

William H. Griffin, trustee, Topeka, KS.

## MEMORANDUM AND ORDER

ROGERS, District Judge.

This is an appeal from the bankruptcy court. The United States contends that the bankruptcy court erred (1) in finding that payments under a covenant not to compete were not property of the debtor's estate and (2) in finding that a payment made by the debtor to the Internal Revenue Service was voluntary and that the IRS is equitably estopped from applying this payment to the debtor's income tax liability. Having carefully reviewed the arguments of the parties, the court is now prepared to rule.

The standards of review are well-settled. The bankruptcy court's findings of fact must be upheld unless they are clearly erroneous. Bankr.R. 8013; *In re Mullet*, 817 F.2d 677, 678 (10th Cir.1987). The bankrupt-

cy court's legal determinations are reviewed *de novo. In re Yeates,* 807 F.2d 874, 877 (10th Cir.1986).

The factual background of this case is generally not in dispute. The debtor is a dentist who has practiced and is currently practicing in Kansas City, Kansas. Over the course of his practice, the debtor incurred significant tax liabilities, some for payroll withholding taxes (941 taxes) and some for income taxes (1040 taxes). Since 1984, the United States has assessed debtor for his failure to pay these taxes and filed a number of notices of federal tax liens. The debtor owed $29,078.97 in 941 taxes and $90,739.65 in 1040 taxes. In 1990, the debtor and IRS revenue officer Robert E. Moore entered into an oral agreement. The agreement provided that the debtor would make monthly payments of $1,000 to the IRS on his payroll tax liabilities and then make a lump sum payment in May 1991 for the remaining balance. Agent Moore had told debtor that he would have to pay all of his payroll taxes before the IRS would consider any offer to compromise or make monthly payments on his income taxes. Debtor made his monthly payments, but he was unable to make the necessary lump sum payment in May. Agent Moore informed the debtor that the IRS was "closing [him] out." In response, the debtor suggested selling his dental practice to satisfy the remaining balance owed on his payroll tax liabilities. The debtor made efforts to sell his business, but he was not successful until the summer of 1992. On June 8, 1992, the IRS mailed debtor its final notices of intention to levy. The notices gave him thirty days to pay the amounts owed or the IRS would seize his property, including his dental practice. The debtor made his efforts to sell his practice known to Agent Moore, and Agent Moore agreed to allow the debtor additional time to sell his practice before the IRS proceeded to levy on the property.

On July 3, 1992, debtor sold his dentistry practice and entered into an asset purchase agreement. Pursuant to the agreement, debtor received a cash payment of $75,000.00, an interest in gross collections generated from the dentistry practice valued at $100,000.00, a security agreement in the as-

sets of the practice until the remainder of the purchase price was paid, and a right to use the facilities of the practice for an indefinite period. The debtor had told the sales agent and the buyer that the purchase amount, less the amount allocated to the debtor's agreement not to compete with the buyer in providing dental services, would have to be sufficient to pay the 941 taxes. The parties agreed to allocate $75,000.00 of the purchase price to the assets of the practice, which was enough to pay the costs and expenses of the sale, the liens prior to the IRS liens, and the 941 debt. They allocated the balance of the purchase price to the non-competition agreement. This amounted to $50,000.00 and was to be paid over several years if certain conditions were met. The debtor has readily admitted that the price of the covenant not to compete represented business goodwill and customer base. After payment of the expenses of the sale, the debtor obtained a cashier's check in the amount of $29,078.97 payable to the IRS and himself. On October 16, 1992, debtor remitted the check to the IRS. The amount of the check was identical to the amount of 941 taxes shown on one of the final notices of intention to levy. The check and the attachments, however, contained no notation directing the IRS to apply it to debtor's 941 taxes. The IRS applied the amount contained on the check to debtor's 1983 and 1984 income taxes. On October 30, 1992, the debtor filed a voluntary petition in bankruptcy under Chapter 13 of the Bankruptcy Code. The debtor had informed the IRS in early October that he was contemplating filing bankruptcy.

The bankruptcy court decided that the postpetition payments made to the debtor pursuant to covenant not to compete were not subject to the tax liens of the IRS. In reaching this conclusion, the court relied upon *In re Wilson,* No. 84–40588 (Bankr. D.Kan.1986), *aff'd,* No. 86–4062–R (D.Kan. 1987). The bankruptcy court also determined that the IRS was equitably estopped from applying debtor's payment of $29,078.97 on October 16, 1992 to his income tax liability. The bankruptcy court held that the IRS was forced to credit the payment to debtor's 941 tax liability.

The court is faced with two issues: (1) Are the payments made pursuant to the covenant not to compete subject to the liens of the IRS? and (2) Should the IRS be equitably estopped from applying the $29,078.97 payment to debtor's 941 taxes?

## I.

■ In general, a federal tax lien attaches to "all property and rights to property, whether real or personal, belonging to" the taxpayer. 26 U.S.C. § 6321. The lien imposed by § 6321 arises when an assessment is made and continues until either the taxpayer's liability is satisfied or the statute of limitations on collection expires. 26 U.S.C. § 6322. Under the Bankruptcy Code, the claim of the IRS is a secured claim only if the claim is secured by a lien on "property in which the estate has an interest" and only "to the extent of the value of such creditor's interest in the estate's interest in such property." 11 U.S.C. § 506(a). The secured status of the IRS is determined as of the petition date. 11 U.S.C. § 506; *In re Riley*, 88 B.R. 906, 912 (Bankr.W.D.Wis.1987). As a general rule, property acquired by the debtor's estate after the commencement of the bankruptcy is not subject to the liens of the IRS. 11 U.S.C. § 552(a); *In re Dente/Pender*, 60 B.R. 164, 165 (Bankr.M.D.Fla.1986).

The question here is whether the monies earned by the debtor from the noncompetition payments constitute earnings from personal services so that they were not part of the debtor's estate at the time of the filing of the bankruptcy petition or constitute proceeds from a contract right which existed and became property of the estate on the filing date. If the noncompetition payments constitute earnings from personal services, the liens of the IRS do not attach because such earnings were not part of the debtor's estate at the commencement of his bankruptcy. If, however, the payments were not considered earnings from personal services, but are deemed proceeds of a contract right which existed and became property of the estate on the filing date, the liens of the IRS would attach.

The issue before the court has arisen in a number of bankruptcy cases, although none involving Chapter 13. One of the earliest cases deciding this issue, *In re Hammond*, 35 B.R. 219 (Bankr.W.D.Okla.1983), held that postpetition noncompetition payments were not property of the estate because these payments were conditioned on the debtor's compliance with the covenant not to compete, and the debtor could not be compelled to perform services for the benefit of his creditors. The court reasoned as follows:

> If an entity, be it Hammond or Hammond's estate, is to receive the payments in question, Hammond must abide by the agreement. We cannot force Hammond to comply. 'The bankrupt ... cannot be compelled to perform work or services for the benefit of his creditors or his trustee in bankruptcy.' 3 Remington on Bankruptcy @ 1228.25 (1941). It is a foil which thrusts both ways. Hammond is therefore performing a service which is not 'sufficiently rooted' in the bankruptcy past so as to render the payments property of the estate.

*Id.* at 223.

The support for *Hammond* in other courts has been limited. In *In re Walden*, 12 F.3d 445, 451–52 (5th Cir.1994), the Fifth Circuit, relying upon *Hammond*, suggested in dicta that annuity payments made pursuant to a covenant not to compete were not part of the debtor's estate because such payments were for services performed by debtor after commencement of case. In *In re Hofstee*, 88 B.R. 308 (Bankr.E.D.Wash.1988), aff'd without opinion, 116 B.R. 872 (9th Cir. BAP 1990), the bankruptcy court initially embraced *Hammond*, but later distinguished it in an addendum to the opinion.

Many cases, however, have criticized *Hammond* and held that such payments were not tantamount to earnings from services performed by the debtor. *See, e.g., In re Johnson*, 178 B.R. 216 (9th Cir. BAP 1995); *In re Andrews*, 153 B.R. 159 (Bankr.E.D.Va.1993); *In re McDaniel*, 141 B.R. 438 (Bankr. N.D.Fla.1992); *In re Prince*, 127 B.R. 187 (N.D.Ill.1991); *In re Bluman*, 125 B.R. 359 (Bankr.E.D.N.Y.1991). In *Johnson*, the bankruptcy appellate panel of the Ninth Circuit explained the essence of these rulings with the following comment: "We conclude

that compliance with a anti-competition agreement is not 'services performed' because refraining from the performance of services is not the performance of services." 178 B.R. at 220.

In *Wilson,* this court considered the issue. After a careful examination of the factual situation, the court affirmed the bankruptcy court's ruling that the postpetition payments under the noncompete agreement were compensation for the debtor's post-bankruptcy personal services and therefore excluded from the bankruptcy estate. In *Wilson,* the debtor sold an automobile dealership prior to filing for bankruptcy. The sales agreement contained a covenant not to compete clause. In reaching the conclusion that the payments under the noncompete agreement constituted earnings for personal services, the court stated:

> The negotiations for Wilson's dealership suggest, as noted by the bankruptcy court, that the non-competition payments were not part of the price for the sale of the business. The addition of the payments to the negotiated sale price would have put the final figure above Wilson's initial asking price. This indeed would have been an odd result. Further, the facts fail to support any contention that these payments constituted value for goodwill. [The buyer] planned to move Wilson's dealership and to operate it under another name. Finally, the facts suggest that the noncompetition agreement was entered into after the purchase agreement had been made. This fact again supports the contention that the payments were not part of the purchase price.

■ After carefully reviewing the recent law on this issue and considering the particular facts of this case, we are convinced that the bankruptcy court erred in concluding that the liens of the IRS did not attach to the noncompetition payments. The court is persuaded by recent opinions that have suggested that the decision in *Hammond* was incorrect and that payments made pursuant to a covenant not to compete are not services performed under the Bankruptcy Code. The court, however, need not decide that *Wilson* was erroneously decided because the particu-

lar facts of this case are readily distinguishable from *Wilson.* The undisputed facts in the record indicate that the noncompetition payments in this case were for goodwill and the customer list. The noncompetition payments were a method of paying for the value of the debtor's goodwill and customer list. The goodwill and the customer list were established prepetition. Under these circumstances, the noncompetition payments are not for postpetition services, but are "sufficiently rooted in the pre-bankruptcy past," such that any legal or equitable interest in property arising therefrom is includable in the bankruptcy estate.

This case is very similar to *Prince.* In *Prince,* an orthodontist filed a petition for bankruptcy. During the pendency of the proceeding, the debtor negotiated the sale of his orthodontist practice. As part of the agreement, the parties entered into a covenant not to compete which prohibited the debtor from engaging in any orthodontist practice in the immediate area. The debtor sought to exclude the noncompetition payments from his estate on the theory that he was earning the payments by not competing. The bankruptcy court held that the payments were for goodwill rather than services and, since the goodwill was inextricably tied to his prepetition activities, the payments were part of the estate. 127 B.R. at 191–92.

■ In his brief, the debtor has not disputed that the noncompetition payments are "rooted in [his] pre-bankruptcy past." Rather, the debtor argues only that these payments should not be regarded as property in the bankruptcy estate because such a finding would entangle his ability to make a "fresh start."

The court is not persuaded by the debtor's argument. As pointed out by the government, the fact that a covenant not to compete is determined to be property of the estate would not affect a debtor's ability to make a fresh start any more than any other type of property which is secured by lien. The concept of a fresh start would not be frustrated where a creditor has a secured claim in payments under a covenant not to compete. As explained by the court in *McDaniel:* "This section [11 U.S.C. § 541] was intended to

give debtor the ability to make a fresh start, not shield his pre-bankruptcy assets from his creditors." 141 B.R. at 440.

Moreover, the debtor's "fresh start" will not be inhibited by this ruling. The covenant not to compete only precludes him from working in an area within seven miles of the practice that he sold. With that exception, he can work anywhere as a dentist, and all of his earnings will be free from the claims of his prepetition creditors.

In sum, the court finds that the bankruptcy court erred in concluding that the liens of the IRS did not attach to the noncompetition payments. The decision of the bankruptcy court is reversed and remanded for proceedings consistent with this opinion.

## II.

The United States next contends that the bankruptcy court erred as a matter of law in holding that the $29,078.97 payment made by the debtor was voluntary, and that the government was estopped from applying this payment to debtor's 1983 and 1984 federal income tax liability.

■ Estoppel is an equitable doctrine which may be invoked to avoid injustice. *Heckler v. Community Health Services, Inc.*, 467 U.S. 51, 59, 104 S.Ct. 2218, 2223–24, 81 L.Ed.2d 42 (1984). For estoppel to apply, a party claiming estoppel "must have relied on its adversary's conduct in such a manner as to change his position for the worse, and that reliance must have been reasonable in that the party claiming the estoppel did not know nor should it have known that its adversary's conduct was misleading." *Id.* The application of estoppel against the government is less than clear. *See Penny v. Giuffrida*, 897 F.2d 1543, 1546 (10th Cir.1990). Although the Supreme Court has never applied estoppel against the government, the Court has left open the possibility that estoppel could be applied under the appropriate circumstances. *Office of Personnel Management v. Richmond*, 496 U.S. 414, 423, 110 S.Ct. 2465, 2471, 110 L.Ed.2d 387 (1990). "[W]e are hesitant ... to say that there are *no cases* in which the public interest in ensuring that the Government can enforce the law free from

estoppel might be outweighed by the countervailing interest of citizens in some minimum standard of decency, honor, reliability in their dealings with their Government." *Heckler*, 467 U.S. at 60–61, 104 S.Ct. at 2224 (emphasis in original). "At a minimum, estoppel against the government is disfavored when its application 'thwarts enforcement of the public laws.'" *Muck v. United States*, 3 F.3d 1378, 1382 (10th Cir.1993) (quoting *Trapper Mining, Inc. v. Lujan*, 923 F.2d 774, 781 (10th Cir.), *cert. denied*, 502 U.S. 821, 112 S.Ct. 81, 116 L.Ed.2d 54 (1991)).

■ A party seeking to establish equitable estoppel against the government has the burden of demonstrating the following traditional elements of estoppel: (1) the party to be estopped must have known the facts; (2) the party to be estopped must intend that his conduct will be acted upon or must so act that the party asserting the estoppel has the right to believe that it was so intended; (3) the party asserting the estoppel must be ignorant of the true facts; and (4) the party asserting the estoppel must rely on the other party's conduct to his injury. *Penny*, 897 F.2d at 1545–46.

■ Having carefully reviewed the arguments of the parties, the court is persuaded that the bankruptcy court correctly decided that the government should be equitably estopped from applying the debtor's prepetition payment of $29,078.97 to his income tax liability. Pursuant to the agreement reached between the debtor and IRS, the payment made by the debtor to the IRS in October 1992 should have been credited to the debtor's 941 tax liability.

The United States has suggested that the payment made by the debtor was not voluntary and therefore debtor could not designate how the payment would be applied. Under the peculiar circumstances of this case, we believe that the payment was voluntary and that the IRS was aware or should have been aware of where the payment was to be applied. "The distinction between a voluntary and involuntary payment ... is not made on the basis of the presence of administrative action alone, but rather the presence of court action or administrative action resulting in the actual seizure or property or

544

money, as in a levy." *Muntwyler v. United States,* 703 F.2d 1030, 1033 (7th Cir.1983). The IRS had issued final notices of intention to levy in this case. However, following the issuance of these notices, the debtor contacted Agent Moore and informed him of his efforts to sell his dental practice in order to make the lump sum payment to the IRS. Agent Moore allowed the debtor additional time to pay voluntarily before the IRS proceeded to levy. These circumstances clearly indicate that the IRS viewed any forthcoming payment as voluntary. The mere presence of the administrative action alone does not convert the debtor's payment into an involuntary payment under these circumstances.

In considering the elements of estoppel, the court is in agreement with the assessment of those factors made by the bankruptcy court. The IRS was well apprised of the facts in this case. The debtor had a running dialogue with Agent Moore on the payment of these taxes. Agent Moore made it clear to the debtor that the IRS was interested in initially collecting the 941 taxes and provided him with an incentive in making these payments. The actions of the IRS, through Agent Moore, gave the debtor every reason to believe that his payment would be applied to his 941 taxes. The statements of Agent Moore after the debtor initially failed to make the lump sum payment led the debtor to believe that the intentions of the IRS had not changed. These statements by Agent Moore suggested that the agreement was still available and allowed the debtor additional time to comply with it. The debtor's actions in obtaining a check in the exact amount of the 941 taxes are an indication that he believed that the earlier agreement was still valid. The debtor was harmed because the application of his payment to his income taxes rather than his 941 taxes has left him with an obligation to pay a greater portion of his total tax debt than he would have paid if the IRS had abided by the original agreement. In sum, the court shall affirm this aspect of the bankruptcy court's ruling because we find that these circumstances compel the application of equitable estoppel. Equitable estoppel against the government under the circumstances of this case serves to promote fair play and does not thwart the enforcement of the public laws. As stated by Justice Jackson in his dissenting opinion in *Federal Crop Insurance Corp. v. Merrill,* 332 U.S. 380, 387–88, 68 S.Ct. 1, 5, 92 L.Ed. 10 (1947): "It is very well to say that those who deal with the Government should turn square corners. But there is no reason why the square corners should constitute a one-way street." Or, as stated by Justice Black in a dissenting opinion in *St. Regis Paper Co. v. United States,* 368 U.S. 208, 229, 82 S.Ct. 289, 301, 7 L.Ed.2d 240 (1961): "Our Government should not by picayunish haggling over the scope of its promise, permit one of its arms to do that which, by any fair construction, the Government has given its word that no arm will do. It is no less good morals and good law that the Government should turn square corners in dealing with the people than that the people should turn square corners in dealing with their government."

**IT IS THEREFORE ORDERED** that the decision of the bankruptcy court is affirmed in part and reversed in part. This case is remanded to the bankruptcy court for further proceedings consistent with this opinion.

**IT IS SO ORDERED.**