**In the Matter of AMERICAN APPLIANCE, et al., Debtors.**

**No. 01–14425/JHW.**

United States Bankruptcy Court, D. New Jersey.

Jan. 25, 2002.

Arthur J. Abramowitz, Cozen and O'Connor, Cherry Hill, NJ, for Debtors.

Daniel Dugan, Robert H. Kwait, Spector, Gadon & Rosen, Moorestown, NJ, for First Republic Bank.

Richard M. Beck, Klehr, Harrison, Harvey, Branzburg & Ellers, LLP, Cherry Hill, NJ, for Neiluv Corp.

Joseph L. Schwartz, Riker, Danzig, Scherer, Hyland & Perretti, LLP, Morristown, NJ, for First Union Bank.

Richard L. Schepacarter, Office of the United States Trustee, Newark, NJ.

## OPINION ON OPPORTUNITY OF FIRST REPUBLIC BANK TO CREDIT BID

JUDITH H. WIZMUR, Bankruptcy Judge.

This matter comes on to be heard on the debtor's motion to approve the sale and assignment of the debtor's leasehold interest in 5510 Concord Pike, Wilmington, Delaware (the "Premises"). The issues presented are whether First Republic Bank, the proposed assignee, (the "Bank") may credit bid its claim against the debtor's estate toward the purchase of debtor's leasehold interest under 11 U.S.C. § 363(k), and whether post-petition payments made by the Bank may qualify as a break-up fee and/or an administrative claim.

### FACTS AND PROCEDURAL HISTORY

On or about March 18, 1993, American Appliance, the debtor [1] herein, (the "Lessee") and Neiluv Corporation, (the "Lessor"), entered into a Ground Lease, whereby Neiluv conveyed a leasehold interest to American Appliance in certain ground located at 5510 Concord Pike, Wilmington, Delaware for a term of twenty years. Under the Ground Lease, American Appliance was to demolish the existing structure and construct a retail appliance store ("Improvements") at its own expense on the Premises. In pertinent part, the Ground Lease provides that "the Improvements hereafter constructed or placed upon the Premises by Lessee ... are not the subject of this Lease, and during the term of this Lease, Lessor shall not acquire pursuant to this Lease, any right, title or interest therein or thereto.... Any Improvements located or constructed on or placed upon the Premises shall, subject to the provisions of Articles 17 [Default Provisions and Remedies] and 27 [Surrender] hereof, be and remain the sole property of the Lessee." ¶ 1.4 of the Ground Lease.

Under the Ground Lease, the opportunity of American Appliance to encumber its leasehold interest is limited by Paragraph 20 of the Ground Lease as follows:

20.1 Lessee shall not mortgage, assign, pledge or otherwise encumber its interest hereunder (except as provided in Article 6 for a Subordinated Mortgage) without the express written consent of Lessor, and any such mortgage, assignment, pledge or other encumbrance made without the consent of Lessor shall be void and of no effect

. . .

20.4 Any purported or attempted mortgage, sublease or assignment of this Lease, or of any interest herein or interest arising hereunder made or attempted to be made other than in accordance with or without full compliance with the provisions of Article 6 and this Article shall be void.

The exception to the requirement that any encumbrance imposed by the Lessee on its leasehold interest requires the express written consent of the Lessor is found in paragraph 6 of the Ground Lease,

---

**1.** References to debtor herein are to American Appliance, Inc., a Delaware Corporation and the Lessee to the Ground Lease (assigned case number 01–14426/JHW).

which requires the Lessor to consent to a mortgage on its reversionary fee simple interest, up to the value of the Improvements, as follows:

6.1 Lessor shall join in the execution of an (sic) "Subordinated Mortgage" (as defined in Section 6.2) within twenty (20) days after Lessee submits a copy of the Subordinated Mortgage to Lessor and requests that Lessor join in its execution. After the execution of an (sic) Subordinated Mortgage by Lessor, the Subordinated Mortgage shall be an accommodation mortgage of Lessor's reversion of fee simple interest in the Premises only, and Lessee shall be entitled to all of the proceeds of any loans secured by the Subordinated Mortgage, and Lessor shall direct any lender making an (sic) Subordinated Mortgage loan to pay the loan proceeds directly to Lessee.

6.2 A mortgage shall be a "Subordinated Mortgage" only if the following conditions are satisfied:

1. The mortgage is made for the purpose of construction of the Improvements or the permanent financing of the Improvements.

. . .

(4) The principal amount of the Subordinated Mortgage shall not exceed the aggregate value of the Lessee's intended site development and construction costs for the Improvements.

In the event of default under the lease, "any first mortgagee of an (sic) Subordinated Mortgage of Lessee's interest" under the Ground Lease, designated as a "Beneficiary", receives notice of such default and has the opportunity to cure the default. ¶ 16.1 of the Ground Lease.

With respect to a party designated as a Beneficiary under the Ground Lease

"[i]f this Lease shall be terminated for any reason by Lessor, or in the event of the rejection or disaffirmance of this Lease pursuant to any bankruptcy law or other law affecting creditors' rights, Lessor will enter into a new lease of the Premises created by this Lease with the Beneficiary, or any party designated by the Beneficiary, not less than ten (10) nor more than thirty (30) days after the request of the Beneficiary, for the remainder of the term of this Lease, effective as of the date of such termination, rejection or disaffirmance, upon all of the terms and provisions contained in this Lease . . . ."

¶ 16.4 of the Ground Lease.

By way of summary, the Ground Lease provisions specify that the Improvements on the Premises belong to the Lessee. With the exception of a Subordinated Mortgage upon the Lessor's reversionary fee simple interest in the Premises, which cannot exceed the value of the construction costs for the Improvements on the property, the Lessee may not encumber its leasehold interest without the express written consent of the Lessor, absent which any such encumbrance is void. The mortgagee of any Subordinated Mortgage placed upon the fee simple interest of the Lessor has the opportunity to enter into a new lease of the Premises with the Lessor in the event of the Lessee's default.

Following the execution of the Ground Lease, American Appliance financed the improvements on the Premises, in the amount of $862,500, through Beneficial National Bank in 1994. Leasehold mortgage and security agreements were entered into against the debtor's leasehold interest in the premises in favor of Beneficial National Bank, with the express written consent

by the Lessor.[2]

On or about July 10, 2000, William C. Rowland, Jr., principal of the debtors, ("Rowland") borrowed the sum of $7,300,000 from the Bank. The debtor executed a Guarantee Agreement for the loan on the same date. As security for the loan, in addition to mortgages on two other properties, an Open End Leasehold Mortgage and Security Agreement ("Original Mortgage") was executed by the debtor in favor of the Bank on the 5510 Concord Pike property. The Original Mortgage specified that the collateral given by the debtor included the debtor's leasehold interest in the Ground Lease, and all Improvements on the Premises. The loan was used, inter alia, to refinance the Beneficial Loan, which was satisfied, and was intended to serve as permanent financing for various American Appliance stores, including the store located on the Premises. Although the Lessor, through counsel, knew about the transaction and was negotiating with the Bank and the debtor regarding the Lessor's consent to a leasehold mortgage to be granted to the Bank[3], the Bank funded the loan on July 10, 2000, without the express written consent of the Lessor. Notwithstanding the lack of express written consent, the debtor warranted and represented in writing to the Bank that all necessary consents had been obtained. See ¶¶ 1(b) and 2(c) of First Republic Mortgage[4]. At the settlement, a

post-closing agreement was entered into between the Bank and Rowland, whereby Rowland agreed to obtain the express written consent of the Lessor by September 15, 2000. The agreement specified that failure to obtain the consent would constitute an additional Event of Default under the loan documents. On July 24, 2000, Neiluv's counsel, Eugene A. DePrinzio, wrote to counsel for the Bank as follows:

> In accordance with Section 20.1 of the Ground Lease dated March 18, 1993, this letter will serve as notice that the Lessor considers the $4,200,000 Leasehold Mortgage of your client on the leasehold interest of American Appliance, Inc. to be void and of no effect since it encumbers such leasehold interest without the consent of the Lessor. The reason consent has not been granted, is that the terms of the draft Collateral Assignment of Lease and Consent to Leasehold Mortgage which you provided under your cover of July 17, 2000 is unacceptable.

The written consent of the Lessor was never achieved, and correspondence between the Bank, Rowland and the Lessor about achieving the Lessor's consent to the First Republic Leasehold Mortgage ceased some time at the end of September 2000.

The various American Appliance debtors filed their bankruptcy petitions on April

---

**2.** Another financing agreement was entered into by the debtor in 1996 with First Union National Bank, which was apparently satisfied in July 2000, from the proceeds of the First Republic Bank loan.

**3.** Negotiations between Neiluv and the Bank included exchanges of drafts of a proposed Collateral Assignment of Lease and Consent to Leasehold Mortgage in late June and early July 2000.

**4.** Robert Mazzei, Vice Chairman of First Republic Bank, certifies that "[i]n reliance on,

inter alia, these representations, First Republic made its $7,300,000.00 loan to Rowland, $4,200,000.00 of which was intended to be secured by the First Republic Mortgage." ¶ 8 of Mazzei Certification, Exh. 2 to Kwait Affidavit. However, it is not possible to reconcile the Bank's active negotiating role with Neiluv to obtain the Lessor's consent to the leasehold mortgage with the Bank's reliance on the debtor's attestations at the July 2000 settlement that no additional consents were needed.

27, 2001. The cases were substantively consolidated on June 28, 2001.

Following the debtor's bankruptcy filing, First Republic determined to advance to the debtor monies to pay the monthly rental and tax obligation on the Premises, from May 2001 through January 2002, for a combined total of $96,515.93 ("Bank Payments"). Until the Assumption and Assignment Agreement ("Agreement") addressed herein, no formal arrangements were made between First Republic and the debtor, and no such arrangements were presented to the Bankruptcy Court for approval, regarding the manner in which such payments would be treated in the context of the debtor's bankruptcy case. The payments enabled the debtor to remain current on their monthly lease obligations to Neiluv, allowing the debtor to propose assumption and assignment under 11 U.S.C. § 365. Neiluv accepted the monthly payments, objecting only to the debtor's motions to extend the time to assume or reject the lease, and agreeing to extensions of time upon assurance of monthly rental payments. Neiluv was apparently aware that the post-petition rent payments on the Premises were being made by advances from the Bank.

The debtor's application to set procedures for the sale and assignment of debtor's lease of the Premises was filed on November 21, 2001. During a telephone conference call on November 28, 2001, on the question of the Bank's opportunity to credit bid, Neiluv raised the issue of the extent and validity of the Bank's lien on the Ground Lease. It was determined that the setting of bidding procedures must await the resolution of the issues relating to the opportunity of First Republic Bank to credit bid, and the extent of the Bank's administrative claim herein.

On or about December 21, 2001, Rowland executed and had delivered to Neiluv a Confirmatory Open End Leasehold Mortgage and Security Agreement naming First Republic as the mortgagee, in the principal amount of $1,281,500 (the "Confirmatory Mortgage"). According to Rowland, the value of the Improvements on the Premises, for the purposes of allowable permanent financing, is no less than that amount. Neiluv was requested to comply with ¶ 6 of the Ground Lease in fixing its consent to what was characterized as a "Subordinated Mortgage." According to Rowland, the purpose of the Confirmatory Mortgage was to subject Neiluv's reversionary fee interest in the property to a lien to secure the permanent financing of the improvements on the property. No additional financing beyond the $7.3 million advanced to Rowland in July 2000 was provided by the Bank in connection with the execution of the Confirmatory Mortgage, which has not been signed on behalf of Neiluv.

The issues presented include the Bank's opportunity to credit bid at a sale of the Ground Lease and the Bank's opportunity to be awarded a break-up fee and/or an administrative claim in connection with advances it has made on behalf of the debtor.

## DISCUSSION

I. First Republic Bank's Opportunity to Credit Bid.

The debtor, the Bank and FRB Realty Corporation ("FRB"), a subsidiary of the Bank which is authorized to do business in the state of Delaware, have entered into an Assumption and Assignment Agreement ("Agreement") regarding the debtor's leasehold interest in the Premises. Pursuant to the Agreement, the debtor has agreed to assume the Ground Lease and to assign it to FRB, free and clear of all liens,

encumbrances, claims and interests.[5] In the Agreement, the debtor acknowledges that the Bank Payments made on account of rent and taxes for the months of May 2001 through January 2002 were "actual and necessary costs and expenses of preserving the Lease which is an asset of the Assignor's [debtor's] estate." ¶ 3 of the Agreement. If the lease is sold or assigned to anyone other than the FRB or the Bank, the Agreement provides that the Bank shall be paid first, from the proceeds of any such sale or assignment, to the extent of all of the Bank Payments made on account of rent and taxes.

> In the event that this Assignment is terminated because the Lease has been assigned or sold to another entity, then the Successful Bidder (as defined herein) shall pay to the Bank (on behalf of the Assignor), on the same day of the closing of such Successful Overbid Transaction (as defined herein) by wire transfer or immediately available funds, an amount equal to the aggregate of all the Bank Payments (the "Termination Payment"). Assignor's obligation to pay the Termination Payment shall survive termination of this Assignment and shall constitute an administrative expense as Assignor's Chapter 11 Case or any subsequent conversion of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code (which shall be a super priority administrative expense claim senior to all other administrative expense claims other than administrative expense claims of Assignor) under sections 503(b) and 507(a)(1) of the Bankruptcy Code. Any motion to approve this Assignment or sale of the Lease shall incorporate this provision

and any Order approving such motions shall so provide.
*Id.*

The Agreement contemplates an auction for the lease, with overbids of at least $5,000 greater than the amount being paid by the Bank, (presumably, the amount of Bank Payments already paid by the Bank). Any overbid must be accompanied by a deposit of $100,000. Under ¶ 5(c), "the Bank, in its sole discretion, may bid, pursuant to 11 U.S.C. § 363(k), at such sale an amount up to its secured claim and, if the Bank purchases the Lease, the Bank may offset as a credit its secured claim against the purchase price of the Lease." The Agreement provides that the proceeds from the sale of the lease "shall be paid to the Bank at the time of closing on account of the Bank's secured claim." *Id.* at ¶ 5(d). If the Bank is the successful bidder, the consideration for the assignment of the lease is the agreement by the Bank "to release and waive any and all of its claims against Assignor under the 5510 Concord Pike Mortgage only. Such release is valued at exceeding $200,000.00 and shall be in addition to the aggregate of all the Bank Payments and the amount of five thousand dollars ($5,000.00), which shall be paid to the Assignor by the Bank at the time of closing." *Id.* at ¶ 7. The release and waiver do not release the debtor's obligations under their guarantees, and the Bank may pursue and enforce a deficiency judgment against the debtor otherwise. The Agreement is conditioned upon Bankruptcy Court approval.

The Bank contends that it has a valid first priority leasehold mortgage against the debtor's leasehold interest in the Premises, and should be entitled under 11 U.S.C. § 363(k) to credit bid its secured debt for the purchase of the Ground

---

5. Rowland claims an ownership interest in the improvements on the premises. The as-signment to FRB contemplates a reservation of the issue regarding the Rowland claim.

Lease. The Bank contends that Neiluv "actually, implicitly, or constructively consented to the First Republic mortgage." In the alternative, the Bank contends that its mortgage is entitled to enforcement, whether or not Neiluv consented to it.

### A. Neiluv's Consent.

■ On this record, the only conclusion that can be drawn is that the express written consent required in the Ground Lease between the debtor and Neiluv as a condition to the imposition of an encumbrance upon the debtor's leasehold interest in the Premises did not occur. Negotiations between the parties, both before and after the settlement of the Bank's loan to Rowland on July 10, 2000, do not advance the Bank's theory that some implicit or constructive consent was afforded by Neiluv. In fact, the confirmation by Neiluv's counsel, by letter dated July 24, 2000, that Neiluv considered the Bank's leasehold mortgage to be null and void in the absence of its consent confirms the absence of "actual, implicit or constructive consent" between Neiluv, the Bank and the debtors regrading the Leasehold Mortgage in favor of the Bank. Nor does the acceptance of monthly rental payments for the debtor, to which Neiluv was and is entitled to under the terms of the Ground Lease, which continues in effect, constitute "implicit or constructive" consent to the Bank's secured claim against the debtor's leasehold interest in the Premises. The absence of express written consent by Neiluv is fatal to the Bank's contention that a valid, binding consent was given by Neiluv.

### B. Neiluv's Standing.

The Bank contends that because Neiluv was owed no money at the time of the filing of the debtors' bankruptcy cases, and consequently, is not a pre-petition creditor of the debtor's bankruptcy estate, that its position is merely that of a prospective bidder on the debtors' leasehold interest. Therefore, contends the Bank, Neiluv lacks the requisite standing to object to the proposed credit bid of the Bank.

■ I must reject the Bank's position in this regard. Neiluv is correct that the test for standing in a Chapter 11 case under the Bankruptcy Code is a broad one, specifying that "[a] party in interest, including the debtor, the trustee, a creditors' committee, an equity holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter." 11 U.S.C. § 1109(b). The test for standing under § 1109(b) does not turn upon whether the party maintains a claim against the debtor. Rather, "[t]he test to determine whether an entity is a party in interest is 'whether the prospective party in interest has a sufficient stake in the outcome of the proceeding so as to require representation.'" *In re Torrez*, 132 B.R. 924, 934 (Bankr.E.D.Ca.1991) (quoting *In re Public Serv. Co. of New Hampshire*, 88 B.R. 546, 551 (Bankr. D.N.H.1988)). *See also In re Amatex Corp.*, 755 F.2d 1034, 1042 (3d Cir. 1985)("courts must determine on a case by case basis whether [there is] a sufficient stake"); *In re Peachtree Lane Assoc., Ltd.*, 188 B.R. 815, 825 (N.D.Ill.1995).

■ Here, Neiluv has a sufficient stake in the outcome of these proceedings. Neiluv is the Lessor on the Ground Lease with American Appliance that is sought to be assumed and assigned under the proposed sale motion. Neiluv has rights under § 365 of the Bankruptcy Code with respect to the proposed assumption and assignment, which rights exist regardless of whether Neiluv is a pre-petition or post-petition creditor of the debtors' estate.

I conclude the Neiluv has standing to assert its position on the debtor's quest to

assume and assign the leasehold interest in question.

### C. Bank's Mortgage is Effective Against the Debtor.

■ The Bank contends that because the leasehold mortgage is proper in form, was duly executed and acknowledged, and was properly recorded in the state of Delaware, that as between the Bank and the debtor, the Leasehold Mortgage is effective and binding upon the debtor. Because the debtor has the right to assign the leasehold interest, notwithstanding any anti-assignment provision in the lease, 11 U.S.C. § 365(f), and because the debtor can only assign the lease subject to the rights of the Bank, which bind the debtor, the Bank's secured claim against the debtors' leasehold interest must be validated in the context of the right of the Bank to credit bid for the debtor's leasehold interest.

■ The validity of the Bank's security interest, and its value for credit bid purposes, must be considered under Delaware law. *See, e.g., Butner v. United States,* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979) (the determination of property rights is a question of state law). Under Delaware law, a lessee holding a leasehold interest on Delaware land for a term of 10 years or more may mortgage his lease or term, 25 DEL.CODE ANN. § 2501, and if such a mortgage is "duly executed, acknowl-

edged and recorded [it] shall operate and be effective as a valid mortgage lien" upon which proceedings may be taken for the foreclosure of the mortgage. 25 DEL.CODE ANN. § 2101(b). While Delaware law permits such an encumbrance, neither party has cited, nor have we found, any Delaware case law addressing the circumstance of a lease which proscribes any encumbrance of the tenant's leasehold interest without the landlord's approval.

In support of the proposition that a leasehold mortgage created without the landlord's consent binds the debtor to the mortgage and acts only as a violation of the lease which allows the landlord to exercise his default remedies, the Bank invokes analogy to the law of assignments. It has been recognized that lease provisions restricting assignment are conceptually analogous to lease prohibitions against encumbering the leasehold interest without the landlord's consent. *In re Putnam Properties, L.P.,* 134 B.R. 477, 480 (Bankr. D.Conn.1991). Cases are cited by the Bank relating to lease provisions restricting assignment, holding that as between the tenant/assignor and the assignee, the assignment is valid even where the lease contains an antiassignment covenant. *See, e.g. Stark v. National Research & Design Corp.,* 33 N.J.Super. 315, 110 A.2d 143 (App.Div.1954); *Nipet Realty, Inc. v. Melvin's Restaurant & Bar, Inc.,* 67 Misc.2d 790, 327 N.Y.S.2d 2 (Civ.Ct.1971).[6]

---

**6.** The Bank also cites to the original Restatement of Property, § 416, comment d to support its position. However, in the Restatement (Second) of Property, Sections 15.1 and 15.2, the indication is that where the parties to the lease agree to restrain transferability absent consent, such clauses may be enforced. In pertinent part, the provisions specify as follows:

Section 15.1 Freedom of Transfer–The interests of the landlord and of the tenant in the leased property are freely transferable, unless:

... (3) the parties to the lease validly agree otherwise. Section 15.2 Restraints on Alienation ... (2) A restraint on alienation without the consent of the landlord of the tenant's interest in the leased property is valid, but the landlord's consent to an alienation by the tenant cannot be withheld unreasonably, unless a freely negotiated provision in the lease gives the landlord an absolute right to withhold consent.
RESTATEMENT (SECOND) OF PROPERTY §§ 15.1 and 15.2 (1976).

However, contrary authority exists for the proposition that a Chapter 11 debtor may avoid a leasehold mortgage where the landlord did not consent, either expressly or impliedly, to an extension of the leasehold mortgage beyond the maturity date.[7] *In re Putnam Properties, L.P.,* 134 B.R. at 480. In *Putnam,* the Ground Lease between the tenant/debtor and the landlord required the landlord's prior written consent to mortgage the leasehold interest. That consent was given for a period of time to encumber the leasehold interest in favor of the lender. However, when the period of the mortgage expired, the landlord did not consent to the extension of the mortgage. The bankruptcy court concluded that the landlord's prior written consent was required for any extension of the leasehold mortgage, which, in turn, renders the security interest derived from the financing agreement between the lender and the tenant null and void following its expiration.[8] *Id.*

Even if we assume that the Bank is correct to assert that the debtor is bound by the leasehold mortgage given to the Bank, and cannot challenge the Bank's secured claim on the basis of the absence of express written consent by the landlord, that conclusion does not offer to the Bank the opportunity to credit bid the alleged value of its perfected security interest in the debtor's leasehold interest Ground Lease. If the subject of the sale was the Improvements on the Premises, putting aside Rowland's claim to ownership of the Improvements, then it appears that the Bank's security interest in the Improvements would be deemed valid, and the Bank could credit bid the extent of its secured claim at an auction. However, the attempt here is to assume and assign the Ground Lease. Neiluv correctly contends that the value of the Bank's security interest in the Ground Lease is properly measured by the enforceable rights the Bank would have against Neiluv in the event that the Bank foreclosed upon the debtors' leasehold interest. In that case, Neiluv would not be bound by the Bank's attempt to substitute for the debtor as the tenant on the Ground Lease. Putting aside the question of the Subordinated Mortgage, the Bank does not otherwise qualify as a "Beneficiary" under the Ground Lease.[9] Therefore, the Bank's security interest in the debtor's leasehold interest in the Ground Lease must be rendered valueless

---

**7.** Neiluv cites the recent Delaware Chancery court case of *Rudnitsky v. Rudnitsky,* 2001 WL 1671149 (Del.Ch. Dec. 20, 2001) for the proposition that where a mortgage is entered into without the requisite authority, the mortgage may be cancelled and declared invalid. Because the *Rudnitsky* case concerns the authority of a partner to act on behalf of the partnership in imposing a lien on partnership property, I believe the case is distinguishable. *See also Rudnitsky v. Rudnitsky,* 2000 WL 1724234 (Del.Ch. Nov. 14, 2000).

**8.** The Bank is incorrect in its assertion that the *Putnam* decision rested on the landlord's consent to the Financing Agreement between the landlord, the lessee and the lender-mortgagee. The restraint in ¶ 14(b) of the Ground Lease against encumbrances on the debtor's leasehold interest without the landlord's prior written consent was the focus of the court's attention regarding the validity of the lender's security interest in the debtor's leasehold interest beyond the maturity date of the Financing Agreement. 134 B.R. at 480.

**9.** Debtor contended at oral argument that because a paragraph of a draft of a proposed agreement between the Bank and Neiluv prior to the July 10, 2000 settlement would have characterized the Bank as a "beneficiary" within the meaning of the Ground Lease, that Neiluv should be bound thereby. That argument must be rejected, since no agreement was ever executed between the parties. A party cannot be bound to particular clauses in proposed drafts of agreements that were not executed, even if particular provisions were not objected to during negotiations.

for the purpose of determining the extent to which the Bank may credit bid on the assignment of the leasehold interest.

### D. Equitable Subrogation.

 The Bank contends that if the leasehold mortgage between the Bank and the debtor is declared to be valueless as to Neiluv, the Bank should be equitably subrogated to the liens of the lenders who were refinanced in July 2000. The principle of equitable subrogation is recognized in the state of Delaware. *See, e.g., Chamison v. HealthTrust, Inc.—Hospital Co.,* 735 A.2d 912 (Del.Ch.1999), *aff'd,* 748 A.2d 407, 2000 WL 275649 (Del.2000); *Olivere v. Taylor,* 65 A.2d 723, 726 (Del.Ch.1949). In *In re Bridge,* 18 F.3d 195, 201 (3d Cir. 1994), the equitable remedy was described by the Third Circuit as follows:

> Generally, when a creditor advances funds to a debtor to pay an existing debt and takes a new mortgage to secure the loan there is no subrogation because the new security manifests the creditor's intent.... Sometimes, however, a creditor's new security may prove to be defective due to fraud or some kind of mistake. In such cases, the doctrine of equitable subrogation can operate to subrogate the new creditor to the position of the lender whose lien was discharged.

 Here, the absence of express written consent by Neiluv at the time the Bank advanced $7,300,000 to Rowland, guaranteed by the debtor, was neither fraud nor mistake. The Bank had been negotiating with Neiluv to attempt to achieve Neiluv's express written consent. That consent had not been achieved as of the settlement date, July 10, 2000. The Bank made a business judgment to fund the loan even in the absence of the Lessor's consent, causing the direct borrower, Rowland, to agree to seek the express written consent of Neiluv by September 15, 2000. The consequence of a failure by Rowland to achieve that express written consent was to offer to the Bank the opportunity to consider that failure as an additional event of default under the loan documents. Again, when no express written consent was forthcoming from Neiluv, the Bank made a business judgment not to declare an event of default. There can be no equitable subrogation on the grounds of either fraud or mistake on these facts.

### E. Equitable Estoppel.

The Bank further contends that because Neiluv accepted rent each month from the debtor after July 2000, continued to accept rent after the bankruptcy petition was filed in April 2001, and did not move to compel termination or rejection of the lease, that Neiluv should be equitably estopped from challenging the Bank's opportunity to credit bid at the auction sale. The argument is premised upon Neiluv's knowledge that the debtor's opportunity to pay monthly rental obligations to Neiluv depended upon the Bank's loan to the debtor and related parties in July 2000, and the Bank's continued post-petition advances toward rent and taxes to the debtor. The Bank contends that it funded the payment of rent on the Premises "on the belief that it had a valid leasehold mortgage." Schermerhorn Affidavit at ¶ 6.

 Under Delaware law, equitable estoppel is a judicial remedy by which a party may be precluded by its own act or omission from asserting a right to which it otherwise would have been entitled. *Genencor Intern., Inc. v. Novo Nordisk A/S,* 766 A.2d 8 (Del.2000). The requirements for establishing equitable estoppel include the following:

> "(1) the party to be estopped must have known the facts; (2) the party to be estopped must intend that his conduct

will be acted upon or must so act that the party asserting the estoppel has the right to believe it was so intended; (3) the party asserting estoppel must be ignorant of the true facts; and (4) the party asserting estoppel must rely on the other party's conduct to his injury." *In re Edison Bros., Inc.*, 268 B.R. 409, 413 (Bankr.D.Del.2001) (quoting *In re Kaplan*, 104 F.3d 589, 601 (3d Cir.1997) (quoting *In re Jones*, 181 B.R. 538, 543 (D.Kan.1995))).

■ Here, three of the four requirements to establish equitable estoppel are missing. There is no doubt that Neiluv knew of the facts involving the Bank's leasehold mortgage. However, the act of Neiluv to continue to accept rent from July 2000 through January 2002, which it is permitted to do under the Ground Lease, is not the type of "conduct" under the *Edison Brothers* standard that would demonstrate Neiluv's intent to induce the Bank to believe that Neiluv's lack of express written consent to the Bank's leasehold mortgage would be overlooked. Nor can there be factual dispute that the party asserting estoppel, i.e., the Bank, was ignorant of the true facts. There is no question that the Bank knew that Neiluv had not expressly consented to the leasehold mortgage, and that the Ground Lease required such express consent. As well, even if we understand that the Bank believed that its leasehold mortgage was valid, it is not possible to conclude that the Bank's belief arose from reliance on the fact that Neiluv was accepting rental payments from the debtor or reliance on the fact the Neiluv was not contesting the extent of the Bank's security interest in the leasehold mortgage during the initial months of the bankruptcy filing.

The Bank's assertion that equitable estoppel applies to preclude Neiluv from asserting its challenge to the Bank's leasehold mortgage is rejected.

**F. Subordinated Mortgage.**

As noted above, under ¶ 6 of the Ground Lease, the Lessor is obligated to join in a "Subordinated Mortgage", to be imposed against the Lessor's reversionary fee simple interest, where the Mortgage is made for the purpose of the construction of the Improvements or the permanent financing of the Improvements on the premises, and where the Mortgage conforms to the written requirements set forth in the lease. While no Subordinated Mortgage was presented to Neiluv when the Bank funded its loan to Rowland and the debtors in July 2000, the Bank has sought, by the submission of the Confirmatory Mortgage to Neiluv for execution in December 2001, to impose such a mortgage in favor of the Bank. The Bank and the debtor contend that the Bank may credit bid against the debtor's leasehold interest at least to the extent of the proposed Confirmatory Mortgage, in the amount of $1,281,500.00, representing the Improvement costs on the premises.

In comparing the Original Mortgage entered into between the debtor and First Republic Bank on July 10, 2000, and the proposed Confirmatory Mortgage forwarded by the debtor and the Bank to Neiluv in December 2001, which contains a proposed "joinder by Neiluv Corporation", it appears that the documents are substantially similar. Highlighted by the debtor is the fact that in ¶ 39 of the Confirmatory Mortgage, there is "confirmation" that

> [n]either the execution and delivery of this Mortgage nor anything contained herein is intended to modify, amend, limit, expand and/or replace any existing indebtedness, liability or obligation of Mortgagor to Lender, nor to modify, amend, limit, expand and/or replace any existing lien or security interest held by Lender for any indebtedness, liability or

obligation of Mortgagor or the priority thereof.

However, selected changes between the Original Mortgage and the Confirmatory Mortgage are noted. For instance, in ¶ 2 entitled "Warranties and Representations", the Original Mortgage contains subsections (a) through (m). The revised document notes some changes in subsection (a), omits subsections (d) through (m), and adds a new subsection (n). In ¶ 3 of the Confirmatory Mortgage, subsection (c) from the original document is omitted. The import of these changes is unclear. The Confirmatory Mortgage indicates in a new ¶ 40 that "[t]o the extent Lender deems it necessary or advisable, Mortgagor shall file a motion with the United States Bankruptcy Court for the District of New Jersey seeking approval for the granting of this Confirmatory Mortgage." No such motion has been filed. In the absence of submission to the creditors of debtor's bankrupt estate, and in light of changes in the language of the Original Mortgage, I cannot conclude on this record that the Confirmatory Mortgage should be honored and should provide the basis for the Bank's designation as a Beneficiary under the Ground Lease, and for the Bank's opportunity to credit bid for the debtor's interest in the Ground Lease.[10]

The inability to validate the Confirmatory Mortgage on this record does not mean that the Original Mortgage between the debtor and the Bank, to the extent that it affords the Bank a security interest in the Improvements on the Premises, cannot be sustained. As noted above, the Improvements are not owned by the Lessor. Any improvements located or constructed on or placed upon the premises remain "the sole property of the Lessee". ¶ 1.4 of the Ground Lease. Therefore, there was no impediment for the debtor (or Rowland, if his claim to ownership of the Improvements is sustained) to afford a valid security interest on the Improvements to the Bank, which they did by the Original Mortgage entered into in July 2000.

On this record, there is no basis to allow the Bank to credit bid on the purchase of the debtor's leasehold interest in the Premises. Any such provision in the proposed Assumption and Assignment Agreement must be stricken.

## II. Break-up Fee and/or Administrative Claim.

As noted above, in the proposed Assumption and Assignment Agreement between the debtor and the Bank, the debtor proposes to acknowledge and confirm that the post-petition payments made by the Bank to the debtor to be applied to monthly rental payments on the premises "were actual and necessary costs and expenses of preserving the Lease which is an asset of the [debtor's] estate." ¶ 3 of the Agreement. The Agreement further provides that if the Lease is assigned or sold to an entity other than the Bank or its designee, the proceeds of the sale must first be used to repay to the Bank the amount of the Bank Payments. Further provision is made for the designation of the Bank Payments as "a super priority administrative expense claim senior to all other administrative expense claims other than expense claims of Assignor [the debtor]." ¶ 3 of the Agreement.

If the Bank is the successful bidder, the consideration for the purchase by the Bank of the debtor's leasehold interest includes the Bank's Agreement to release claims against the debtor under the Leasehold Mortgage only, "valued at exceeding

10. The debtor is not precluded from presenting the Confirmatory Mortgage to the bankruptcy court for approval, upon proper notice to all parties in interest.

$200,000, the amount of $96,513.93 that has already been paid by the Bank, and an additional $5,000, which shall be paid by the Bank to the debtor at the time of closing." ¶ 7 of the Agreement. The Agreement provides that the proceeds from the sale of the Lease shall be paid to the Bank at the time of closing on account of the Bank's secured claims. ¶ 5(d) of the Agreement. Assuming that the Bank is successful in acquiring the leasehold interest, the Agreement contemplates the opportunity of Rowland and the Bank to market the property, including the Ground Lease and Improvements, following the assignment of the lease to the Bank.

If the Bank is unsuccessful in acquiring the debtor's leasehold interest, the successful bidder must pay at least $101,513.93 to the debtor, the proceeds of which would presumably be paid to the Bank on account of Bank Payments and on account of the Bank's secured claim. ¶¶ 3 and 5(d) of the Agreement.

 The concept of designating the Bank Payments as a break-up fee is first mentioned in the submission of the Bank dated January 11, 2002. As was recognized in *In re O'Brien Environmental Energy, Inc.*, 181 F.3d 527, 528 (3d Cir.1999), the term "break-up fee" refers to a fee paid by a seller to a prospective purchaser in the event that a contemplated transaction is not consummated. The *O'Brien* Court held that a "determination whether break-up fees or expenses are allowable under § 503(b) must be made in reference to general administrative expense jurisprudence", and "depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate." *Id.* at 535. Where a break-up fee would serve to advantage a favored purchaser over other bidders, or where a potential purchaser would bid whether or not break-up fees are offered, the award of

a break-up fee cannot be characterized as necessary to preserve the value of the estate. *Id.*

 Here, it appears that the Bank holds a valid, perfected security interest in the Improvements on the Premises. In order to insure the retention of value of the Improvements, the viability of the Ground Lease must be maintained. The Bank made a business judgment at the commencement of the debtor's case to fund the monthly rental payments to Neiluv, with no formal arrangements regarding repayment, and no reference to its intention to bid on the debtor's leasehold interest. It is certainly true that without the payments, the debtor may have been compelled to reject the lease, and to lose potential value for the estate. The value proposed to be realized by the estate with regard to this transaction may be as little as $5,000. I conclude that a determination of whether the so-called break-up fee, or the administrative claim, constitutes an actual, necessary cost of preserving the value of the estate under § 503(b) must await the conduct of the sale of the debtor's leasehold interest. Accordingly, the quest by the Bank to designate the Bank Payments as a break-up fee and/or an administrative claim is denied without prejudice on this record, but may be renewed following the disposition of the debtor's leasehold interest in the Ground Lease.

Further proceedings in connection with the debtor's motion to approve the Assumption and Assignment Agreement will follow.