**In re Anthony Jack LASPINA, Amy Jean Keskinen–LaSpina, Debtors.**

**No. 03–51667.**

United States Bankruptcy Court, S.D. Ohio, Eastern Division.

Feb. 11, 2004.

Anthony Jack LaSpina, Dublin, OH, pro se.

Amy Jean Keskinen–LaSpina, Dublin, OH, pro se.

Susan L. Rhiel, Rhiel & Associates Co., LPA, Columbus, OH, trustee.

Matthew J. Thompson, Columbus, OH, for Debtors.

Ruth Ann Hohl, Rhiel and Associates, Columbus, OH, for Susan L. Rhiel, trustee.

Alexander G. Barkan, Office of U.S. Trustee, Columbus, OH, U.S. Trustee.

## ORDER GRANTING THE TRUSTEE'S MOTION FOR AN ORDER REQUIRING DEBTORS TO SURRENDER PROPERTY OF THE ESTATE AND DENYING THE DEBTORS' MOTION TO ABANDON SEVERANCE PAY PROCEEDS

CHARLES M. CALDWELL, Bankruptcy Judge.

On June 3, 2003, Susan L. Rhiel ("Trustee") filed a Motion for an Order Requiring Debtors to Surrender Property of the Estate. The Trustee seeks to recover post petition payments in the net amount of $25,460.23.[1] They were received by Anthony Jack LaSpina ("Debtor") from his former employer, the GAP, Inc. ("GAP"). On June 5, 2003, the Debtors' Motion to Abandon Severance Pay Proceeds was filed. A hearing was conducted on September 15, 2003. Based upon testimony, documents received into evidence, a review of the pleadings and the statements of the parties, the Court has determined that the

---

**1.** This amount includes severance and two salary continuation payments in the net amount of $22,595.29, one salary continuation payment in the net amount of $1,697.87, and payment for accrued paid time off in the net amount of $1,167.07.

Trustee's Motion should be granted, and the Debtors' Motion should be denied. A brief history will illustrate the bases for these decisions.

On March 22, 1999, the Debtor was hired as the Director of Finance for the GAP. Nearly four years later, in the middle of January 2003, the Debtor was informed that based upon performance, his employment would be terminated. As an alternative, the Debtor was given an opportunity to resign with the provision of a severance package. Subsequently, the Debtor and a Ms. Lisa Flesher, the Senior Director of Human Resources for GAP ("Ms. Flesher"), commenced negotiations on a severance agreement ("Agreement"). In these discussions the Debtor represented his interests. Ms. Flesher consulted GAP's Corporate Counsel, a Mr. Kevin Vilke ("Mr. Vilke").

Initially, the Agreement was sent to the Debtor on January 29, 2003. Then, it was finalized on January 31, 2003, and faxed to the Debtor on that date for his signature. The Agreement specified that it constituted the arrangement for termination of employment between GAP and the Debtor, and contained two important defined terms as follows:

> You have agreed to cease performing any duties for the Company as of February 7, 2003 your "Last Day Worked". As of that date, you no longer have the authority to bind the Company in any transaction or to incur any expenses on its behalf. Notwithstanding the foregoing, we will continue to pay you through February 28, 2003 at which time your employment with Gap Inc. will terminate (the "Termination date"). Between your Last Day Worked and your Termination Date, you will continue to receive the employee benefits that you currently receive, except that you will no longer accrue Paid Time Off. On your Termination Date, you will be paid for all your accrued unused paid time off. Your current benefit plan coverages will end on February 28, 2003. (emphasis supplied).

The consideration for this Agreement included, on the part of the GAP, severance, references, relocation assistance, partial payment of COBRA benefits, outplacement assistance, forgiveness of a relocation payback agreement, and revised terms on an outstanding relocation loan. Specifically regarding the severance, the Agreement provided that the Debtor was to receive, ". . . a lump sum amount equivalent to 12 weeks salary within two weeks of the Termination Date or the date we receive this letter signed by you, whichever is later. . . ."

From the Debtor's standpoint, the consideration included: a duty to keep the terms of the Agreement confidential and to not disclose trade secrets and other confidential information; a duty not to disparage; a release of all claims against the GAP; a duty not to solicit any GAP employees to leave; a duty to cooperate in any litigation, and a duty to reconcile any outstanding cash advances. The Agreement was closed with the following admonition and execution instructions:

> This letter constitutes our entire agreement regarding your termination and supersedes any previous agreements or understandings, if any, between us. This is a legally binding agreement. You are advised to consult with an attorney prior to signing the agreement. You have 21 days to consider this letter (but you may sign it sooner). If after carefully reviewing this letter, it correctly sets forth our agreement, please acknowledge this by signing both original letters where indicated below. One letter is for your files. Please return the other to me. After signing this letter

you may change your mind within 7 days. In order to do so, you must notify me in writing within 7 days after the date you sign this letter that you intend to revoke it or you will be forever bound by the terms of this agreement. This agreement will not be effective until the 7–day period has elapsed.

According to the testimony of Mr. Vilke, when the Agreement was not immediately returned, Ms. Flesher reached the Debtor by telephone on February 7, 2003, after previous unsuccessful attempts. Mr. Vilke testified that at that time the Debtor stated that he had not received the Agreement. Ms. Flesher agreed to fax it again. Also, according to the testimony of Mr. Vilke, the Debtor requested that the date of the Agreement be changed from January 31, 2003, to February 28, 2003. No explanation for this request was given, according to Mr. Vilke.

Ms. Flesher consulted Mr. Vilke regarding changing the date, and he told her no. Mr. Vilke testified that the refusal was based upon the fact that the Agreement was accurately dated on the date it was initially faxed to the Debtor. In reliance upon the execution of the Agreement, on February 15, 2003, the GAP issued one salary continuation payment to the Debtor in the net amount of $1,697.87. Mr. Vilke advised Ms. Flesher, however, not to make any further payments until the Agreement was signed and returned by the Debtor. According to Mr. Vilke, even after the February 7, 2003, conversation between Ms. Flesher and the Debtor, the Agreement was not returned to GAP, although Ms. Flesher placed several calls to the Debtor. Mr. Vilke testified that Ms. Flesher even confirmed with the Debtor's spouse on February 10, 2003, that the Agreement had been received.

In the middle of February 2003, a letter was received from a Mark Granger, as counsel for the Debtor. Mr. Granger requested modification of the Agreement to delete the confidentiality provision and to include a mutual release. Subsequently, Mr. Vilke talked to Mr. Granger and explained the terms, and stated that a mutual release would not be provided because the Agreement was to have been signed on January 31, 2003, and the GAP did not want to wait any longer. The record indicates that on February 27, 2003, the GAP issued a check in the net amount of $1,167.07, which represents the Debtor's accrued paid time off.

According to Mr. Vilke, the signed Agreement was finally received from the Debtor by telefax late in the day on February 28, 2003. The Agreement, however, had been altered to strike the original date of January 31, 2003, and it was replaced with the date of February 7, 2003. Also, the date of February 28, 2003, appears by the signature of the Debtor. Subsequently, on March 3, 2003, the GAP issued a check in the net amount of $22,595.29 to the Debtor, and sent it by federal express. This check included a gross severance payment of $30,000.00 and two salary continuation payments in the gross amount of $5,000.00.

The Court finds that the Agreement expressly provided that the Debtor's last day of work was to be February 7, 2003; however, he would continue to receive funds equivalent to his salary until February 28, 2003. During this three-week period, he continued to receive all employee benefits, except for the accrual of any additional paid time off which is equivalent to vacation pay. As a result, the Agreement provided for post petition payments to the Debtor in three forms: severance, salary continuation payments and accrued paid time off. The severance was based upon twelve weeks of the Debtor's salary. The salary continuation payments were for the

three weeks between the Debtor's "Last Day Worked" (February 7, 2003) and his "Termination Date" (February 28, 2003). The accrued time paid off was to compensate the Debtor for all unused accrued paid time off.

The book on the relationship between the Debtor and the GAP would have ended here, but for the fact that on February 7, 2003, at 3:58 p.m. a voluntary chapter 7 petition was filed on behalf of the Debtor, and his wife, Amy Jean Keskinen–LaSpina. This filing date is just one week after the Agreement was finalized and faxed to the Debtor, and is the same date the Debtor talked to Ms. Flesher about signing the Agreement. It is also the same date placed on the Agreement returned to the GAP by the Debtor.

Turning to the content of the bankruptcy filing, on the Schedule I–Current Income of Individual Debtor(s), the Debtor listed the GAP as his employer at the rate of $10,833.33 gross per month. The Schedule I, however, included the following notation, "Anthony LaSpina is separating from employment effective mid February 2003." Also, on Schedule B–Personal Property and in response to Question 20 (contingent and unliquidated claims), it was disclosed that there was a claim against the GAP for "Employment Issues" but in an "Unknown" amount. At best these disclosures are incomplete. The record indicates that by at least mid January 2003, the Debtor knew he was being terminated. Armed with this knowledge he commenced negotiations that culminated in the Agreement. It was finalized and faxed to the Debtor on January 31, 2003, just one week prior to the bankruptcy filing.

■ The dispute between the parties essentially raises the issue of whether the Debtor's employment claims against the GAP and the resulting post petition proceeds in the form of severance, salary con-tinuation payments and accrued paid time off, constitute property of the estate subject to administration by the Trustee. 11 U.S.C. § 704(1). Or rather, as appears to be asserted on behalf of the Debtors, the payments instead constitute earnings for services performed post petition, such as the Debtor's agreement not to solicit GAP employees, not to disparage, or not to disclose trade secrets.

The starting point is the United States Bankruptcy Code ("Code"). Section 541 of the Code defines the term "property of the estate" and exclusions in relevant part as follows:

(a) The commencement of a case under section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:

(1) Except as provided in subsections (b) and (c)(2) of this section, *all legal or equitable interests of the debtor in property as of the commencement of the case.*

. . .

(6) Proceeds, product, offspring, rents, or profits of or from property of the estate, *except such as are earnings from services performed by an individual debtor after the commencement of the case* . . . .

11 U.S.C. § 541(a)(1) and (6) (emphasis supplied).

■ In construing this language with reference to claims, causes of actions and contract rights that may result in post petition payments, courts have taken the view that the definition of property of the estate should be accorded expansive treatment. On the other hand, courts have limited the scope of any exclusions, such as for services performed post petition, governed by Section 541(a)(6) of the Code. *In re Carson,* 82 B.R. 847, 850–852 (Bankr. S.D.Oh.1987) *citing U.S. v. Whiting Pools,*

*Inc.,* 462 U.S. 198, 204, 103 S.Ct. 2309, 2313, 76 L.Ed.2d 515 (1983); *Booth v. Vaughan (In re Booth),* 260 B.R. 281, 284–290 (6th Cir. BAP 2001). Typically, funds are not subject to the post petition services exclusion, unless they accrue as the result of actual services performed post petition, or are conditioned upon the performance of continued services post petition. *In re Carson,* 82 B.R. at 852.

■ With reference to post petition payments related to contractual relationships, such as employment, the focus has been on whether the payments are, "... ' sufficiently rooted in the pre bankruptcy past' as to be included within the bankruptcy estate." *Rau v. Ryerson (In re Ryerson),* 739 F.2d 1423, 1426 (9th Cir.1984); *Johnson v. Taxel (In re Johnson),* 178 B.R. 216, 219 (9th Cir. BAP 1995); *In re Edmonds,* 263 B.R. 828, 831 (E.D.Mich.2001). In line with this principle, courts have treated severance benefits as estate property. *Rau v. Ryerson (In re Ryerson),* 30 B.R. 541, 543 (9th Cir. BAP 1983), *aff'd* 739 F.2d 1423 (9th Cir.1984); *In re Phillips,* 45 B.R. 529, 531 (Bankr.N.D.Oh.1984); *In re Dennison,* 84 B.R. 846, 847–848 (Bankr. S.D.Fla.1988); *In re Bartholomew,* 214 B.R. 322, 324–325 (Bankr.S.D.Oh.1997).

Regarding payments based upon non compete agreements, the majority view is that these payments are not excluded as earnings for post petition services performed. The rationale is that a plain reading of Section 541(a)(6) of the Code only excludes earnings for services performed, rather than those based upon an obligation not to perform. Also, non compete agreements are inextricably linked to the termination of the pre petition relationship by ensuring that the related promises are fulfilled. *In re Alstad,* 265 B.R. 488, 490–492 (Bankr.M.D.Fla.2001); *In re Johnson,* 178 B.R. at 219–222; *Contra In re Hammond,* 35 B.R. 219, 223, 224 (Bankr.W.D.Okla.

1983); Howard B. Kleinberg, *Postpetition Payments to a Debtor Under a Non–Compete Agreement Typically Are Deemed Property of the Estate and Subject to Creditors' Claims,* 119 Banking L.J. 282 (2002) (The author provides an overview of the case law on non compete agreements in the bankruptcy context).

In applying the Code and the case law to the instant dispute, the Court has reached three conclusions. First, the Debtor knew at least by mid January 2003 that his employment with the GAP was at an end, and rather than being terminated he engaged in severance negotiations that culminated in the January 31, 2003, Agreement. All of this occurred during the month immediately preceding the date of the bankruptcy filing. The Agreement specified February 7, 2003, as his last day of work but allowed the Debtor to continue to receive three salary continuation payments without performing any work for a three-week period until his termination became effective on February 28, 2003. The Agreement also allowed the Debtor to be paid for any accrued paid time off, and most significantly provided for severance that was based upon twelve weeks of salary he would have received if employed by the GAP. After February 7, 2003, the Debtor did not have the authority to perform any further services on behalf of the GAP.

Second, on the date of the bankruptcy filing the Debtor's claims against the GAP became property of the estate, and were subject to administration by the Trustee. Without regard to the significance of the alteration of the dates on the Agreement, at a minimum there should have been more detailed disclosure on the bankruptcy schedules regarding what was contemplated or what had been negotiated, including the amounts. Certainly, when the funds were received they should have been

turned over to the Trustee. It is not for parties to decide in a vacuum whether assets constitute property of the estate. Rather, the appropriate route is full disclosure. In the event of a dispute or novel factors, the parties should seek a judicial determination, rather than relying on their judgment.

Third, regarding the post petition payments, based upon a review of the Agreement they are firmly rooted in the pre petition employment relationship between the Debtor and the GAP. The payments were not compensation for any post petition services to be performed by the Debtor. Rather, they were payments based upon his pre petition employment relationship, and were geared toward ending that relationship amicably and without litigation. The covenants not to solicit any employees, to not disparage or to not disclose secrets, are not additional services performed post petition. Instead, they are arrangements to protect the interests of the GAP since the pre petition employment relationship ended.

For these reasons, the Court grants the Trustee's Motion for an Order Requiring Debtors to Surrender Property of the Estate. In accordance with this Order the Court has entered a separate judgment entry against the Debtors in the amount of $25,460.23, including interest at the statutory rate from date of entry of this Order, plus collection costs. Further, in accordance with this Order the Court denies the Debtors' Motion to Abandon Severance Pay Proceeds.

IT IS SO ORDERED.